**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ERNEST KRYGIER, <br>         Plaintiff <br> v. <br><br> CLARK UNIVERSITY AND <br> TRUSTEES OF CLARK UNIVERSITY <br>         Defendants. | Civil Action No. _____ <br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFF'S COMPLAINT

### INTRODUCTION AND NATURE OF THIS ACTTION

Plaintiff Ernest Krygier ("Professor Krygier" or "Plaintiff") brings this action for damages against Clark University ("Clark" or "Clark University" or the "University") and Trustees of Clark University. [1] Together Clark University and Trustees of Clark University are referred to as "Defendants".

1.     This matter arises out of the actions taken and procedures employed by Clark University in response to false allegations of sexual harassment made by a Clark University student, Jane Roe ("Roe"), to justify terminating Professor Krygier's long-term employment. [2]

2.     Roe first made these allegations in a Title IX complaint in March 2022, though many of the alleged unlawful actions occurred in 2019.

---

[1] The Trustees of Clark University submitted the Position Statement on behalf of Clark University in response to the Charge of discrimination Professor Krygier filed with the Massachusetts Commission Against Discrimination ("MCAD") and the United States Equal Employment Opportunity Commission ("EEOC") related to certain of his claims being brought herein.

[2] This student did not file her Title IX complaint anonymously.  However, the MCAD requested that her name be redacted as a nonparty student in Professor Krygier's Charge of discrimination.  Thus, Plaintiff has not provided her name in this complaint.  However, Plaintiff can disclose her name publicly or confidentially to the Court as deemed appropriate.

3.     In addition to being Roe's teacher for various courses she took in Clark's Department of Chemistry, Professor Krygier was Roe's supervisor when she worked as a Stockroom Assistant.

4.     In February 2022, there was an incident where Roe was supposed to make multiple bottles of a specific concentration of Sodium Hydroxide.  Because of certain mistakes of these being more concentrated than what Professor Krygier needed, he pointed out this mistake to Roe.

5.     Roe was Professor Krygier's senior work study student, and he depended on her to get certain things done.  At first blush, it did not appear to Professor Krygier that Roe had any issues in correcting her mistake.

6.     Before this incident in late February 2022, Professor Krygier also had some discussions with Roe about her tardiness and some communication issues where hours were changed last minute without him  knowing.

7.     Shortly thereafter, On or about March 1, 2022, Professor Krygier was told that Roe had filed a Title IX complaint of sexual harassment against him.

8.     Roe is a rather outspoken person, and she usually had no issues expressing problems with Professor Krygier in the past, either regarding students or faculty.  She had not previously complained to Professor Krygier about the allegations being brought up in her Title IX complaint.  Thus, he was completely blindsided by the accusations.

9.     Importantly, Roe's  complaint did not allege that Professor Krygier sought any type of sexual relationship with her or allege any quid pro quo.

**Complaint - Page 2**

10.     Rather, it arose out of an alleged hostile academic and work environment based on an alleged romantic relationship involving Roe's roommate and Professor Krygier from 2019.

11.     Though this former student left Clark University in the fall of 2019 and later enrolled in attend another university, Roe alleged in March 2022 that Professor Krygier created a hostile environment for her because he allegedly shared sexual details of this relationship with Roe.

12.     When Clark made Professor Krygier aware of Roe's allegations, it paid lip service to fairly and objectively investigating and adjudicating the allegations against him.

13.     However, Clark deprived Professor Krygier of basic fairness when it conducted a disciplinary process related to Roe's allegations, engaged in dilatory tactics, and made arbitrary findings that he was responsible for two of Roe's seven allegations.

14.     Realizing that these thin findings of Title IX violations could not justify terminating Professor Krygier's employment, Clark dug up documents placed in his personnel file in 2013 regarding alleged wrongdoing, which did not involve sexual harassment allegations.

15.     Clark used this years-old information, which was placed in Professor Krygier's personnel file without his knowledge in violation of the Massachusetts personnel records law, to justify Professor Krygier's approximate nineteen-year tenure of employment with Clark.

16.     The process was not impartial, exhibited gender bias against Professor Krygier as an accused male employee, and deprived him of basic rights to a fair proceeding, including timely access to evidence and assistance, misappropriating statements to him that were

actually made by Roe, and denial of the opportunity to be heard by an impartial decisionmaker.

17. At the end of its biased and unfair investigation, Clark initially gave Professor Krygier the impression that he could continue to teach in the Chemistry Department, but he could not supervise students going forward.

18. After Professor Krygier appealed Clark's arbitrary and biased decisions, it further "investigated" him beyond the Title IX allegation, denied his appeals, treated him horribly, and terminated his employment.

19. At the last stage of his appeal, Professor Krygier sought assistance from the American Association of University Professors ("AAUP").

20. When the AAUP requested that Professor Krygier be provided with procedural due process before his employment is terminated, Clark ignored the request.

21. Throughout the process, Clark denied Professor Krygier procedural due process and did not substantively consider his appeals.

22. Professor Krygier therefore brings this action for relief based on causes of action for violations of Title IX, Title VII, breach of contract, and breach of the duty of good faith and fair dealing, denial of basic fairness/arbitrary and capricious decision-making, and other state law causes of action.

## PARTIES

23. Plaintiff Ernest Krygier is an individual residing in Massachusetts who may be contacted through the undersigned counsel.

24. Defendant Clark University is a private university located in Worcester, Massachusetts.

25.     Upon information and belief, Defendant Trustees of Clark University is the governing body of Clark University.

## JURISDICTION AND VENUE

26.     The Court has personal jurisdiction over each of the defendants because they conduct business within the Commonwealth of Massachusetts.

27.     The Court has subject matter jurisdiction over this controversy, based on, among other things, the federal statutory causes of action pled herein.   This Court has pendent jurisdiction with regard to the state-law claims asserted herein.

28.     Venue is proper in the Central Division because Clark University is considered to reside in Worcester County.   In addition, venue is proper because many of the wrongful acts complained of occurred in Worcester County.

## FACTUAL BACKGROUND

**I.      PROFESSOR KRYGIER'S EMPLOYMENT WITH CLARK UNIVERSITY**

29.     Professor Krygier attended Clark University for both his undergraduate and graduate degrees. He received his Bachelor of Arts in Biochemistry & Molecular Biology in May of 2001, followed by his Master of Arts in Chemistry in 2005.

30.     During his undergraduate career he tutored students in Chemistry and aided in the Introduction to Chemistry labs.   This experience led him to apply and gain the role of Instructor starting in the Fall of 2004.

31.     Professor Krygier's role within the department and teaching skills continued to grow, and he developed new courses for the department.   He was promoted to full-time lecturer in 2013.

32.     He was promoted to Senior Lecturer in 2019 and then his title was changed to Teaching Professor in  2022.  This was the highest position he could attain at the University.

33.     In addition to teaching courses and the laboratories, he advised students during the regular school year, as well as during the summer.

34.     Professor Krygier proved to be a skilled and popular teacher, demonstrated by his performance evaluations and promotions. Throughout his employment at Clark, he received excellent reviews from students for his teaching.

35.     He thus continued to receive additional employment contracts and renewals from Clark.

36.     He also stepped up and took on roles that were not in his purview to help out the department. These included overseeing tutoring services within the department, acting as the Stockroom Manager and being a supervisor for the department work study students.

37.     Professor Krygier was not compensated for these additional services and many times in his evaluations it was stated as such.

38.     He was also asked to serve on various committees at Clark over the years. Service is part of the faculty member's position.

39.     Professor Krygier was asked to be part of the N3TF Task Forces in the Fall of 2013. He was then voted unto the Undergraduate Judicial Board in the Fall of 2015 and was re-voted into the position after each term (3 years).

40.     In addition, he was asked to join the Pre-health Council in the Fall of 2015 after Christopher Landee retired from the University. He was also asked to become part of

the Transitional Leadership Team for Healthy Science and Society in the spring of 2017 and was co-chair his last year at Clark.

## II. ROE'S TITLE IX COMPLAINT AND ALLEGATIONS

41.   On or about March 1, 2022, Professor Krygier was informed about several allegations being made by Roe, which were to be investigated pursuant to Title IX.

42.   The allegations related to sexual harassment and whether a hostile work or academic environment had been created for Roe by Professor Krygier.  There were no allegations of quid pro quo harassment or any allegations regarding a sexual relationship between Professor Krygier and  Roe.

43.   On their face, the allegations did not appear to support a claim for sexual harassment under the law or Clark's policy.

44.   Professor Krygier cooperated fully with the Title IX investigation.

45.   At the time Roe made the allegations in March 2022, Roe had taken numerous courses taught by Professor Krygier in the Department of Chemistry.

46.   In addition, Roe worked as a Stockroom Assistant at Clark over a period of approximately two and a half  years with Professor Krygier as her supervisor for a majority of her employment.

47.   Furthermore, during the COVID 19 pandemic, Roe assisted Professor Krygier with typing and organizing lecture notes for a blind student.  In addition, she picked up the mail for the Chemistry Department.  She was compensated by Clark for these tasks.

48.   Leading up to her Title IX complaint, Roe was upset regarding work situation based on some mistakes pointed out by Professor Krygier.

49.    On March 1, 2022,  Clark notified Professor Krygier through a letter from Jessica Brown, Deputy Title IX Coordinator, that Roe had made the following allegations against him:

- In 2019, you engaged in a romantic relationship with [Roe's] former roommate and invited [Roe] and [her roommate] for dinner and over to your residence.
- In Fall 2019, you discussed with [Roe] another employee watching pornography at work.
- From 2019 - 2022, you discussed with [Roe] details about your romantic relationship with [her roommate], including conversation about your sex life, and asked [Roe] personal questions about her romantic life.
- In 2020, you discussed other students and colleagues with [Roe]e and called them "dumb", "lazy", and "bitches."
- From 2020 - 2022, you isolated [Roe] in her work in the stockroom, expressed hostility, asked [Roe] to do personal tasks for you, and told [Roe], "You work for me" after all other stockroom workers were moved to Dr. Narro's supervision.
- In 2022, you joked with [Roe] about pranking your old college roommate with tiger balm, so he would be burned when he masturbated.

### III.    CLARK'S BIASED TITLE IX INVESTIGATION AND PROCEDURAL DEFECTS

50.    In the March 1, 2022, letter Clark told Professor Krygier that Brigid Harrington had been assigned to conduct the Title IX investigation.

51.    Clark's letter further stated that "[t]he University strives to complete the investigation process in approximately sixty (60) business days. Should this timeline need to be extended, you will be notified in writing of the need for an extension along with the reason for the extension and the new date of completion."

52.    Professor Kryger met with Ms. Harrington on March 8, 2022, without an advisor.

53.    It was implied to Professor Krygier that obtaining an advisor would slow down the process so he proceeded without one.

54.    Professor Krygier was confident that he had not engaged in sexual harassment and fully cooperated in the investigatory process.

55.     During his interview with Ms. Harrington, she did not appear particularly interested in his point of view and took few notes.

56.     The next day, on March 9, 2022, Professor Krygier met with Ms. Brown.  During this meeting, he requested an advisor to assist him with the process and asked for help with getting counseling.

57.     Ms. Brown told Professor Krygier that the University would not and did not have any resources to help him with counseling.

58.     She noted Professor Krygier wanted an Advisor and stated she would look into it.

59.     On April 15, 2022, after hearing no updates on an advisor, Professor Krygier contacted Ms. Brown about an advisor.

60.     Ms. Brown then asked Professor Krygier what kind of advisor he wanted at that time.

61.     Through the entire process Professor Krygier frequently asked for updates about an advisor, but each time he was told Clark had no advisor for him.

62.     Finally, Clark informed him on June 22, 2022, that they found him an advisor.

63.     However, he was not given his advisor's information until June 28, 2022.  Thus, it took Clark 111 days from Professor Krygier's request to provide him with an advisor to help him navigate the process.

64.     On April 21, 2022, long before he was provided with an advisor, Professor Krygier submitted evidence for his case, which was to be uploaded to Onehub for review by all parties.

65.     On April 25, 2022, Professor Krygier was informed that Roe was granted until April 29, 2002, to be allowed to review and offer a rebuttal to the evidence he supplied.

66. Roe submitted evidence on April 29, 2002.  However, this evidence was not uploaded to Onehub for Professor Krygier's review.

67. Clark removed Professor Krygier's access to the documents and evidence submitted until June 22, 2022, when he was supplied with a report and details of the outcome.

68. Professor Krygier contacted Ms. Brown about evidence listed on Onehub to which he had been denied access and met with her on June 27, 2022.

69. During this meeting, Ms. Brown stated that the investigator found the evidence provided by Roe on April 29, 2022, had little bearing on his case.

70. However, this information was cited several times in the final report that Clark provided to Professor Krygier.

71. Thus, Clark was engaging in unfair and unequal treatment of Professor Krygier during the Title IX investigation.

72. On May 16, 2022, Professor Krygier met with Ms. Brown again with concerns regarding his contract with Clark.  During this meeting, Ms. Brown assured him that the Title IX investigation had nothing to do with him not receiving a contract by this time

73. Ms. Brown further stated that the only individuals who are privy to the investigation are the Title IX office, Human Resources, witnesses, Roe, and Professor Krygier. She stated unequivocally that no one in upper administration is involved with the Title IX investigation.

74. The next day, on May 17, 2022, Clark provided Professor Krygier with a contract that states the fact that he is being investigated.

75.     Thus it became clear that Professor Krygier's contract had been sent to people at Clark who had no previous knowledge that he was being investigated.

76.     That day, Ms. Brown contacted Professor Krygier to let him know that upper administration was involved.

77.     Ms. Brown does not specify who now had knowledge regarding the supposed confidential Title IX investigation but claimed it was only for supportive measures.

78.     Professor Krygier once again asked Ms. Brown for help, and she stated the only thing the University would do was offer him a leave of absence.

79.     Professor Krygier asked her about updates on his advisor and was told Clark was processing it.

80.     Thus, it became clear that Clark was not keeping the Title IX investigation confidential. Professor Kryger had expressed to Ms. Brown that he would overhear students talking about it, as well as the fact students and faculty began to avoid him in public. (Some going as so far to turn around to not even pass him in the hallway). Ms. Brown said she was sorry to hear all of this, but there was nothing she could do.

81.     On Friday, July 29, 2022, Assistant Provost Esther Jones emailed Professor Krygier and told him he was being administratively assigned to work on remote projects.

82.     On Aug. 22, 2022, Professor Krygier was informed by a member of the Chemistry Faculty that another member of my department (Donald Spratt) was telling other faculty members details about his case and other untrue statements.

83.     On the same day, Denis Larochelle, Chair of the Prehealth Advisory Committee, told Professor Krygier that he was being removed from that committee.   Professor

Larochelle did not initially give Professor Krygier a reason for removing him from a committee he had served on for over seven years.

84. Subsequently, Professor Krygier was told that the panel needed more diversity, and that it was just best if he was not on it anymore (Professor Krygier had already been removed from the Clark website as part of the committee).

85. Based on Clark's actions, Professor Krygier thought that the comments about him were being spread among the faculty and potentially could have reached the determination panel, influencing the outcome of his Title IX investigation.

86. Professor Krygier's Title IX hearing was held via Zoom on August 18, 2022, and he was suddenly removed from a long-standing committee position just four days later (and long before any finding was made regarding Roe's Title IX allegations).

87. On or about August 12, 2022, Professor Krygier was informed that the policies governing the process would be changed and enforced last minute by Clark.

88. In addition, Clark unexpectedly informed Professor Krygier on or about August 15, 2022, that his main contact to that point, Ms. Brown would be immediately transitioning out of his case, and Ann James would be taking over.

89. At that point, Professor Krygier had not had any interaction with Ms. James other than receiving an email from her with the Zoom information about his hearing.

### IV.    DELAYS AND UNFAIR TREATMENT OF PROFESSOR KRYGIER DURING THE TITLE IX HEARING

90. The Title IX hearing did not follow standard procedures as Professor Krygier had been told by Ms. Brown (prior to her departure from his case) and his advisor, Holly Dolan.

91. The hearing was scheduled to begin at 11:00 a.m., but it was delayed 3 times until 12:30 p.m. for no explained reason.

92. The hearing chair, Julie Gallup, Esq. whose expertise is in family did not appear to have any experience with employment law or sexual harassment matters.

93. In addition, she was an hour and a half late and did not appear to be knowledgeable about Clark's policies in how the hearing was to be conducted.

94. Attorney Gallup was not prepared to answer questions about how the hearing would proceed when Roe's father, a practicing attorney, asked about objecting to statements and cross examining witnesses.

95. Attorney Gallup not understanding the Title IX procedure was further demonstrated when Roe's father attempted to have testimony given by Professor Krygier stricken from the record because the response was not to his liking.  Attorney Gallup did not know how to respond to his request.

96. It was previously stated to Professor Krygier by Ms. Brown and Cherie Scricca, Clark's Title IX Coordinator, that the hearing is not a court hearing and things such as objections are not allowed.

97. Documentation provided to Professor Krygier ahead of the hearing stated that "[t]he Hearing Board will be presided over by a trained Board Chair who will make evidentiary rulings and enforce the rules of decorum."

98. Attorney Gallup was not a trained Board Chair capable of presiding over the hearing.

99. She did not appear to have a basic understanding of the law to understand what is and is not considered sexual harassment, nor familiarity with Clark's policy regarding sexual harassment.

**Complaint - Page 13**

100. During the hearing Attorney Gallup allowed irrelevant questions to be asked and allowed Roe's father (her advisor) to badger Professor Krygier and insult him and his father's intelligence.

101. Roe's father made comments that Professor Krygier "must not be a very good teacher" and "it is clear your father is not an educated man" or words to that effect.

102. During this time, Professor Krygier's advisor, Ms. Dolan, was messaging the Hearing Board chair and asking about "relevance?"

103. However, Attorney Gallup did not respond. She continued to allow Roe's father's snide remarks to infect the process, which attacked Professor Krygier's character and competence as an educator.

104. Ms. Dolan had to practically beg Attorney Gallup for a break after the humiliating and irrelevant questioning.

105. This was in stark contrast to the respect that was shown to Roe during her questioning.

106. This contrast was very obvious during the Title IX hearing.

107. Information gained from the hearing was also absent from the documents supplied by the University in response to Professor Krygier's request made in a letter dated December 26, 2022, requesting all documents and witness testimony from the Title IX case (which should have included transcripts from the Title IX hearing).

108. Professor Krygier sought all this information during the internal appeal process related to the Title IX determinations made by Clark.

109. Clark repeatedly and blatantly violated its own rules and procedures, which included a July 29, 2022, letter stating the following: "Expect to be treated fairly and respectfully and without animus, threat, or harassment throughout the process by everyone with a

role in the hearing process; and, that action will be taken by the Title IX Coordinator should any individual with a role in the process compromise the integrity of the hearing process and/or treat others in the process in a manner that harasses, threatens, or otherwise discourages participation. You will be treated without presumption of responsibility for the alleged conduct during the hearing and appeals processes."

110.   Attorney Gallup did not appear to have considered this policy. Rather, she showed a bias towards the complainant based on gender, with no understanding of the law regarding what constitutes severe or pervasive behavior.

111.   Professor Krygier had been told that it was not a court case, yet it felt very much like it was.  Attorney Gallup, the hearing chair, never objected to any questions asked, even those with no relevance to the case at hand. It was a free for all – but only against Professor Krygier.

112.   Ms. Dolan, who had worked on other Title IX cases before (serving on the determination panel) stated to Professor Krygier that the way his hearing was being handled was not normal.

113.   She stated that the panel normally asks more questions of both the respondent and the complainant, and she did not know why the hearing chair was allowing irrelevant questions to be asked.

114.   Ms. Dolan also expressed concern that the hearing chair seemed to be ignoring the private messages she had sent to her about the relevance of the questions being asked of Professor Krygier.

**Complaint - Page 15**

115.   Furthermore, the Title IX Coordinator, Ms. Scricca, and Title IX Deputy Coordinator, Ms. Brown discouraged Professor Krygier from having an attorney present to represent him at the hearing.

116.   Ms. Brown told Professor Krygier that the hearing was not a court case, that parties could not object (something Attorney Gallup allowed Roe's father to do), and other unprofessional conduct would not be tolerated.

117.   She also informed Professor Krygier that Roe would not have an attorney present, so there would really be no reason for Professor Krygier to have one present.

118.   Professor Krygier felt this to be a misrepresentation since Roe's father was a practicing attorney.

119.   At the end of the hearing, Professor Krygier was told that he would receive a decision in two weeks or by September 1, 2022.

120.   After receiving no communication from Clark after the hearing, Professor Krygier contacted the Title IX office and was told that he would have an answer by September 4, 2022.

121.   After receiving no answer on that date, he again contacted the Title IX office on September 9, 2022.

122.   Professor Krygier received a response on September 12, 2022, stating that he may receive an answer by September 16 or 19, 2022.

123.   Professor Krygier was never given reasons for the massive delays, let alone why he always had to contact the Title IX office to get any information about his case.

124.   It appeared to Professor Krygier that Clark was not concerned about complying with any procedures they initially communicated to him.

**Complaint - Page 16**

125.    The extreme delay in giving Professor Krygier any information appeared to him to be a breach in procedure, especially considering he was told he would originally have an answer on September 1, 2022.

126.    Professor Krygier received notice of the Hearing Board's decision on September 19, 2022, which was more than 200 days after he was notified of Roe's allegations against him.

127.    This was after Clark represented to Professor Krygier that "[t]he University strives to complete the investigation process in approximately sixty (60) business days. Should this timeline need to be extended, you will be notified in writing of the need for an extension along with the reason for the extension and the new date of completion."

128.    The Hearing Board's September 19, 2022, decision found Professor Krygier responsible for two of seven allegations made by Roe.[3]   The decision stated in part, the following:

Determination
The Hearing Board found by a preponderance of evidence that you violated the Clark University Sexual Offense Policy regarding sexual harassment on two of the seven allegations by:
• engaging in a romantic relationship with Witness 2 and sharing information regarding this relationship with [Roe]; and,
• repeatedly sharing a story involving your college roommate and Tiger Balm
Sanction
You will not be permitted to supervise students (undergraduate and graduate) in any capacity, indefinitely.

129.    Professor Krygier was understandably disappointed with the decision.  He felt that he had provided credible evidence that, if viewed objectively, should have absolved him of all of Roe's sexual harassment allegations.

---

[3] Though Roe had initially made six allegations, a seventh was later added to her Title IX complaint.

**Complaint - Page 17**

### V.   __PROFESSOR KRYGIER'S SEPTEMBER 27, 2022, APPEAL IS DENIED__

130. On or about September 27, 2022, Professor Krygier appealed the Hearing Board's determination.  He inquired regarding whether Clark's Provost would be the Appeal Officer.

131. Clark's Title IX office responded that the Provost had appointed the Associate Provost, Esther Jones, as the Appeal Officer to review his appeal of the Hearing Board's decision.

132. Professor Krygier pointed out to Associate Provost Jones the numerous violations of procedural safeguards and denial of access to information, as discussed above.

133. In addition, regarding the first allegations he pointed out The Hearing Board stated that they determined that the relationship with Roe's roommate occurred during the summer of 2019. However, this went against the weight of the testimony from the relevant witnesses.

134. Roe's partner at the time stated in his testimony that he knew that Professor Krygier and Roe's roommate at the time were not in a relationship until after Roe's roommate withdrew from the University.  This evidence from someone who one would think would support Roe's timeline was ignored.

135. Additionally, the Hearing Board found, again without credible supporting evidence, that Roe stopped going to Professor Krygier's office for help with organic chemistry and biochemistry because of an intimidating academic environment.

136. What the evidence actually showed was that Roe said she stopped going on occasion because she no longer needed help.  Roe further stated that she would still go to Professor Krygier's office with friends. Roe commented that Professor Krygier's

behavior was appropriate, and she stopped going to his office when taking Biochemistry because it was not Professor Krygier's expertise.

137.   Thus, Professor Krygier's appeal pointed out that the Hearing Board ignored exculpatory evidence, invented facts, and made assumptions in order to justify the subjective outcome they wish to reach.

138.   Professor Krygier further pointed out that the Hearing Board did not ask any questions related to this topic. This demonstrated clear bias against him when no objective panel could have found his behavior to constitute severe and pervasive sexual harassment against Roe.

139.   There was also no evidence that supported Roe's allegations that Professor Krygier frequently spoke with Roe about his relationship with her roommate.  Professor Krygier pointed out in his appeal that there was certainly no evidence of this happening over the course of several years.  He pointed out in his appeal that this could not be considered severe and pervasive sexual harassment.

140.   Regarding the second allegation of Professor Krygier sharing a story about his college roommate and Tiger Balm, no objective panel could have found this story being told twice over a span of three years as constituting severe and pervasive sexual harassment.

141.   Professor Krygier testified he told the story in question twice, once in 2019 to the group of students and once in 2022 to Roe.

142.   The hearing board stated in their decision that the story was told repeatedly, when the uncontroverted evidence showed that in fact the story was NOT told over and over again but only twice in three years.

**Complaint - Page 19**

143.   Professor Krygier pointed out to Assistant Provost Jones that this demonstrated clear bias against him because no objective panel could have found this story being told twice to constitute severe and pervasive sexual harassment against Roe.

144.   On or about October 25, 2022, Clark's Title IX appellant office denied Professor Krygier's appeal, stating there were no procedural errors.

145.   It was clear that Clark had not seriously considered Professor Krygier's grounds for his appeal.

### VI.   CLARK'S NOVEMBER 4, 2022, NOTICE OF NONRENEWAL OF PROFESSOR KRYGIER'S CONTRACT

146.   Professor Krygier received his sanctions from Clark in a letter dated November 4, 2022, from Provost Sebastian Royo.

147.   This letter stated that Clark was terminating his employment and would not be renewing his teaching contract.

148.   The letter further provided that Professor Krygier could appeal to Clark's Faculty Review Committee ("FRC").

149.   On January 20, 2023, Professor Krygier appealed this decision and included his reasons for why the University had: (a) violated his academic freedom related to his use of social media and freedom of expression and committed due process violations of AAUP practices; (b) committed discrimination; and (c) failed to adequately consider his positions.

150.   Just nine days later, on January 29, 2023, the Chair of the FRC stated that the FRC had "carefully considered" Professor Krygier's evidence but would not pursue further investigation of his complaint.

151.    This was after communications sent by Anita Levy at the American Association of University Professors ("AAUP") had sent a letter on Professor Krygier's behalf that "[a] post-dismissal appeal of an administrative action is not an acceptable substitute for a prior dismissal hearing at which the administration must offer specific charges and must bear the burden of demonstrating adequate cause."  A copy of this January 13, 2023, letter to Clark's President is attached hereto as Exhibit 1 and incorporated by reference.

152.    Clark's response was that Professor Krygier would NOT be afforded such due process and stated that "[w]hile we have no intention of withdrawing the notice with which you have referenced, rest assured that Mr. Krygier has been and will continue to be treated with dignity, respect, and fairness throughout this currently pending matter."  A copy of Clark's responsive letter dated January 19, 2023, is attached hereto as Exhibit 2 and incorporated by reference.

153.    Ms. Levy wrote back on January 24, 2023, and stated that the AAUP "must dispute your conclusion that Professor Krygier was afforded all 'indispensable safeguards' of due process." A copy of this letter is attached hereto as Exhibit 3 and incorporated by reference.

154.    As a teacher, Professor Krygier was encouraged by Clark to meet with students outside of class time upon their request to provide mentoring, guidance, and instruction.  All meetings were strictly professional meetings between teacher and students, as is commonplace in the college educational context.

**Complaint - Page 21**

155.   Roe never brought up any incidents over her multi-year association with Professor Krygier allegedly making her feel uncomfortable until he brought up issues with her work performance in February 2022.

156.   She continued to take courses with Professor Krygier and work with him as her supervisor in the stockroom until shortly before filing her complaint.

157.   Examples of her communications over time with Professor Krygier and public Twitter posts are attached hereto as Exhibit 4 and incorporated by reference.

158.   Professor Krygier had a conversation with Ms. Brown during the course of the Title IX investigation and brought up Roe's Twitter messages regarding putting Acetone into a professor's coffee.

159.   Ms. Brown asked if this was related to a male professor, and Professor Krygier replied yes.

160.   She then requested pictures of the text messages and Twitter posts regarding Roe threatening to make a different male professor's life miserable. She said that it would be provided to the proper people at Clark.

161.   Professor Krygier provided Ms. Brown with all information requested, but it does not seem to have been objectively reviewed or considered during the course of the Title IX investigation against him.

162.   When Professor Krygier later inquired regarding what happened with the Acetone in a professor's coffee post and any related investigation, Ms. Brown said that he would not be privy to the outcome of any such investigation.

163.   Numerous students gave testimony that Professor Krygier's behavior was appropriate.

164.   In May 2020, the United States Department of Education ("DOE") issued final regulations for Title IX of the Education Amendments of 1972 ("Title IX").  Title IX prohibits discrimination on the basis of sex in education programs or activities receiving federal financial assistance.

165.   DOE's May 2020 final regulations require that "hostile environment" claims, as opposed to quid pro quo requests for sexual activity, must be both severe and pervasive, as well as objectively offensive, in order to constitute a violation of Title IX.

166.   Under these regulations, which are applicable to Professor Krygier's case, Clark University  should have analyzed how a reasonable person would view the conduct when determining whether the conduct constitutes sexual harassment.

167.   Clark failed to do so.  In fact, it appeared to go out of its way to view the alleged conduct in the light most favorable to Roe to reach its results.

168.   Professor Krygier has met all statutory prerequisites required for bringing the claims herein.

169.   He timely dual filed a discrimination complaint with the MCAD and EEOC, has withdrawn his complaint, and has been provided with dismissal/right to sue letters from both agencies authorizing  him to bring his claims in court.  All his claims are being brought within applicable statutes of limitations.  The dismissal notices from the MCAD and EEOC are attached hereto as Exhibit 5.

## LEGAL CLAIMS[4]

### COUNT I
### 20 U.S.C. 1681 *et seq.*
### VIOLATION OF TITLE IX

170. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

171. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq.*, provides, in relevant part:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

172. Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant Clark University.

173. Title IX may be violated by a university imposing unfair discipline on an individual accused of sexual harassment where gender is a motivating factor in the decision and may be remedied through a private right of action.

174. Title IX requires schools to adopt grievance procedures providing for prompt and equitable resolution of sexual misconduct complaints. *See* 34 C.F.R. § 106.8(b).

175. The First Circuit recognizes the erroneous outcome theory of liability.

176. To plead an erroneous outcome claim under Title IX, a Plaintiff found responsible for sexual harassment in a college disciplinary proceeding must allege: (1) facts sufficient to "cast some articulable doubt on the accuracy of the outcome of the disciplinary

---

[4] All claims are being brought against both Defendants since the Trustees of Clark University act as the University's governing body and represented Clark University in front of the MCAD.

proceeding," and (2) "gender bias was a motivating factor." *See Doe v. Trs. of Bos. Coll.,* 892 F.3d 67, 91 (1st Cir. 2018).

177.    With respect to the first element, Defendants' finding that Professor Krygier was responsible for sexual harassment was utterly erroneous.  Facts casting a great deal of "articulable doubt" on the accuracy of the outcome are described in detail above, but such facts include, without limitation: (a) the Hearing Board ignoring statements of students regarding Professor Krygier acting appropriately with his students at all times; (b) Clark denying Professor Krygier access to evidence so he could better prepare for the hearing and find corroborating evidence; (c) Clark failing to weigh exculpatory text messages and other evidence presented by Professor Krygier; and (d) the Hearing Board wrongfully attributing derogatory terms such as "bitch" to Professor Krygier, when it was Roe who actually used the term.

178.    In addition, there is evidence that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon Professor Krygier.  This includes a failure to afford a presumption of innocence, as Clark conducted its investigation.  In addition, Clark imposed an interim measure of banning Professor Krygier from his teaching and from the campus before a hearing was even held regarding Roe's Title IX complaint.

179.    Clark terminated Professor Krygier without procedural protections, even after the AAUP requested that such procedures be employed before Clark terminated his employment.

180.    Clark's prejudging Professor Krygier as the accused male resulted in an erroneous finding of responsibility after a biased investigation, and eventually a wrongful termination motivated by gender bias.

181.    Clark subjected Professor Krygier to a wholly unfair process, which was tilted in favor of the female complainant and against the male respondent.

182.    Despite the fact that Clark's investigation had resulted in imposition of lesser sanctions from the Hearing Board, Clark dug up old information from Professor Krygier's personnel file to find something to justify his employment termination after the very thin allegations for which he was actually found responsible.   It was clear that, objectively, Professor Krygier's actions and behavior could not possibly constitute sexual harassment of Roe.

183.    Moreover, one of Professor Krygier's students made him aware of a female professor who had romantic and sexual relationships with her female students.

184.    This student said other Clark students were aware of this, and he knew someone personally who was having a romantic relationship with a female professor.

185.    This student went to the female professor's  house for social events, game nights, *etc*.

186.    He said other students, including graduate students were present, and the relationship was out in the open.

187.    Upon information and belief, other Clark Faculty and administration were aware of this female professor's relationships with her students.[5]

---

[5] Plaintiff has not provided her name in this complaint out of privacy concerns.  However, Plaintiff can disclose her name publicly or confidentially to the Court as deemed appropriate.  Plaintiff is also happy to provide the name to Defendants during the discovery process.

**Complaint - Page 26**

188. Upon information and belief, no disciplinary actions have been taken against this current female professor

189. This unlawful discrimination in violation of Title IX has caused Professor Krygier to sustain substantial damages, including, but not limited to: severe emotional distress; injury to reputation; past and future economic loss; deprivations of fair process; loss of educational opportunities; and loss of future employment prospects.

**COUNT II**
**MASS. GEN. L. ch. 151B *et. seq.* – GENDER DISCRIMINATION**
**IN VIOLATION OF MASSACHUSETTS FAIR EMPLOYMENT PRACTICES**

190. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

191. Mass. Gen. L. ch. 151B et. seq. prohibits an employer from discriminating against anyone on the basis of their gender. Mass. Gen. L. ch. 151B et. seq.

192. By the conduct alleged in detail above and herein, Defendants violated Mass. Gen. L. ch. 151B et. seq. by subjecting Professor Krygier to disparate treatment and disparate discipline on the basis of his gender.

193. Professor Krygier is a member of a protected class because he is a male.

194. He was qualified to work as an employee for Clark University and more than satisfactorily performed the duties required by the positions he held.

195. Defendants took several adverse employment decisions against Plaintiff, including employment termination and nonrenewal of his contract

196. Upon information and belief, a female professor who engaged in romantic relationships with her students is still employed by Clark University.

197.    Defendants discriminated against Professor Krygier through disparate compared to similarly situated individuals outside his protected class in violation of his rights.

198.    The discrimination and disparate treatment leading to Professor Krygier's employment termination has caused him to suffer great harm.

199.    This includes, without limitation, emotional and psychological harm, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

**COUNT III**
**42 U.S.C. § 2000e *et seq.* – GENDER**
**DISCRIMINATION IN VIOLATION OF TITLE VII**

200.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

201.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., prohibits an employer from discriminating against any employee on the basis of their sex.

202.    By the conduct alleged in detail above and herein, Defendants violated Title VII by subjecting Professor Krygier to disparate treatment and disparate discipline on the basis of his gender.

203.    Professor Krygier is a member of a protected class because he is a male.

204.    He was qualified to work as an employee for Clark University and more than satisfactorily performed the duties required by the positions he held.

205.    Defendants took several adverse employment decisions against Plaintiff, including employment termination and nonrenewal of his contract

206.    Upon information and belief, a female professor who engaged in romantic relationships with her students is still employed by Clark University.

207.   Defendants discriminated against Professor Krygier through disparate compared to similarly situated individuals outside his protected class in violation of his rights.

208.   The discrimination and disparate treatment leading to Professor Krygier's employment termination has caused him to suffer great harm.

209.   This includes, without limitation, emotional and psychological harm, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT IV
## BREAH OF CONTRACT

210.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

211.   Professor Krygier signed an employment contract that incorporated Defendants' policies, including those that relate to non-discrimination, sexual harassment, and process.

212.   Based on the aforementioned facts and circumstances, Defendants breached express and implied agreements with Professor Krygier.  This includes, without limitation, the following: (a) failure to conduct a fair and impartial investigation; (b) failure to appoint a trained and impartial individual to conduct a fair hearing on Roe's Title IX claims; (c) failure to render objective findings; (d) wrongful discipline and employment termination without due process; (e) failure to provide Professor Krygier timely access to evidence; (f) not providing Professor Krygier with the presumption of innocence in contradiction of Defendants' representations and policies; (g) predetermining that it would believer Roe's narrative despite what the objective evidence showed; (f)

engaging in lengthy delays without explanation; and (g) not providing Professor Krygier with a dismissal hearing prior to his employment termination at which the University offered specific charges and bore the burden of demonstrating adequate cause.

213. These violations resulted in a process that was neither fair nor impartial, ultimately resulting in an erroneous finding against Professor Krygier and wrongful termination of his long-term employment with Clark.

214. As a direct result of the Defendants' conduct, Professor Krygier has sustained tremendous damages, including, without limitation, loss of income and career opportunities, past and future economic injuries, and other direct and consequential damages.

## COUNT V
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### DENIAL OF BASIC FAIRNESS

215. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

216. Professor Krygier's employment contract with Clark contained an implied covenant of good faith and fair dealing, as does every Massachusetts contract

217. It implicitly guaranteed that any disciplinary proceedings would be conducted with basic fairness.

218. Massachusetts courts have held as part of the implied covenant of good faith and fair dealing that school disciplinary hearings must be "conducted with basic fairness." *See, e.g., Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 725 (1st Cir. 1983).

219.   Consistent with the implied covenant of good faith and fair dealing, Clark's policy also promised that the investigation or Roe's Title IX complaint would be fair and impartial.

220.   Thus, Defendants owed a duty to ensure that the proceedings against Professor Krygier were conducted in good faith and with basic fairness.

221.   Based on the aforementioned facts and circumstances, Defendants breached the implied covenant of good faith and fair dealing and denied Professor Krygier basic fairness based on, without limitation, the following: (a) failure to conduct a fair and impartial investigation; (b) failure to appoint a trained and impartial individual to conduct a fair hearing on Roe's Title IX claims; (c) failure to render objective findings; (d) wrongful discipline and employment termination without due process; (e) failure to timely provide Professor Krygier access to evidence; (f) not providing Professor Krygier with the presumption of innocence in contradiction of Defendants' representations and policies; (g) predetermining that it would believer Roe's narrative despite what the objective evidence showed; (f) engaging in lengthy delays without explanation; and (g) not providing Professor Krygier with a dismissal hearing prior to his employment termination at which the University offered specific charges and bore the burden of demonstrating adequate cause.

222.   These violations resulted in a process that was neither fair nor impartial, ultimately resulting in an erroneous finding against Professor Krygier and wrongful termination of his long-term employment with Clark.

223.   As a direct result of the Defendants' conduct, Professor Krygier has sustained tremendous damages, including, without limitation, loss of income and career

opportunities, past and future economic injuries, and other direct and consequential damages.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.  Judgment against Defendants and damages for the injuries caused by Defendants as described above;

B.  For enhanced and exemplary damages as provided by applicable Massachusetts and federal law;

C.  For attorneys' fees, interest, and costs; and

D.  Such other and further relief as this Court deems appropriate.

## JURY TRIAL DEMANDED

Professor Krygier requests a jury trial on all issues so triable.

Dated: June 10, 2024

Respectfully submitted,
ERNEST KRYGIER
By his attorney,

*/s/ Shehzad Rajwani*
Shehzad S. Rajwani (BBO # 674442)
THE HARBOR LAW GROUP
96 West Main Street, Suite C
Northborough, MA  01532
(508) 393-9244 – Phone
(508) 393-9245 – Fax
Email: srajwani@harborlaw.com

**Complaint - Page 32**