# Exhibit 1



AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

555 New Jersey Ave., NW, Suite 600, Washington, DC 20001
**PHONE:** 202.737.5900 • **www.aaup.org**

<u>VIA ELECTRONIC MAIL</u>

January 13, 2023

Dr. David Fithian
President
Clark University
Worcester, Massachusetts

Dear President Fithian:

Mr. Ernest Krygier, until recently a teaching professor in the Gustaf H. Carlson School of Chemistry at Clark University, has sought the advice and assistance of the American Association of University Professors as a result of an email dated November 4, 2022, from Provost Sebastián Royo, notifying him of the termination of his services effective immediately. We understand that the stated basis for this action is "the full slate of evidence of ongoing behavior constituting 'lack of fitness/moral turpitude" stemming from a 2022 Title IX investigation, as well as a "prior documented formal reprimand" and "letter of notice" from 2013.

The Association's interest in Professor Krygier's case is rooted in our longstanding concern for academic freedom, tenure, and due process, the basic tenets of which are set forth in the attached 1940 *Statement of Principles on Academic Freedom and Tenure*. As you doubtless know, the 1940 *Statement* was issued jointly by the AAUP and the Association of American Colleges and Universities. It has received the endorsement of more than 250 professional organizations and learned societies. Derivative procedural standards applicable to his case are set forth in the Association's attached *Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments* and our *Recommended Institutional Regulations on Academic Freedom and Tenure* (also attached). We note relevant provisions of the university's *Faculty Handbook*, some of which conform in essential respects to AAUP recommended standards.

According to the information provided to us by Professor Krygier, he joined the faculty of Clark University in a full-time capacity in 2008 after teaching in a part-time capacity beginning in 2004. We understand that Professor Krygier intends to appeal the notice of nonreappointment.

\*        \*        \*

The 1940 *Statement of Principles on Academic Freedom and Tenure* calls for a maximum period of probation not to exceed seven years, with service beyond the probationary period constituting continuous appointment or tenure. Upon continuance of full-time service beyond a maximum probationary period, faculty members who so serve

President Fithian
January 13, 2023
Page 2

are entitled under the 1940 *Statement* to the protections of tenure. Professor Krygier was completing his fourteenth year of full-time teaching at the university when he was notified by the administration that his contract would not be renewed beyond the fall 2022 semester.  Professor Krygier had plainly attained continuous tenure under the provisions of the 1940 *Statement of Principles*, and thus is entitled through length of service under these provisions to the safeguards of academic due process that accrue with tenure in any action to terminate his services.

We appreciate that the administration's action was in the form of a nonrenewal of a contract, and that Professor Krygier has the right to appeal pursuant to the Clark University faculty handbook section II.A.6.(b).  A post-dismissal appeal of an administrative action is not an acceptable substitute for a prior dismissal hearing at which the administration must offer specific charges and must bear the burden of demonstrating adequate cause. It is crucial that the Clark University administration provide its faculty this indispensable safeguard of academic freedom.

We recognize that the information on which this letter is based has been provided to us primarily by Professor Krygier. We would therefore welcome your comments. If, however, the facts recounted above are essentially accurate, we recommend that the notice of November 4 be withdrawn and that future action regarding Professor Krygier, if any is to be taken, be consistent with the principles and standards referenced above.

We look forward to your response.

Sincerely,

Anita Levy, Ph.D.
Associate Secretary

Enclosures

cc:     Dr. Sebastián Royo, Provost
        Professor Ernest Krygier

# 1940 Statement of Principles on Academic Freedom and Tenure

## with 1970 Interpretive Comments

In 1915 the Committee on Academic Freedom and Academic Tenure of the American Association of University Professors formulated a statement of principles on academic freedom and academic tenure known as the 1915 *Declaration of Principles*, which was officially endorsed by the Association at its Second Annual Meeting held in Washington, D.C., December 31, 1915, and January 1, 1916.

In 1925 the American Council on Education called a conference of representatives of a number of its constituent members, among them the American Association of University Professors, for the purpose of formulating a shorter statement of principles on academic freedom and tenure. The statement formulated at this conference, known as the 1925 *Conference Statement on Academic Freedom and Tenure*, was endorsed by the Association of American Colleges (now the Association of American Colleges and Universities) in 1925 and by the American Association of University Professors in 1926.

In 1940, following a series of joint conferences begun in 1934, representatives of the American Association of University Professors and of the Association of American Colleges agreed on a restatement of the principles that had been set forth in the 1925 *Conference Statement on Academic Freedom and Tenure*. This restatement is known to the profession as the 1940 *Statement of Principles on Academic Freedom and Tenure*.

Following extensive discussions on the 1940 *Statement of Principles on Academic Freedom and Tenure* with leading educational associations and with individual faculty members and administrators, a joint committee of the AAUP and the Association of American Colleges met during 1969 to reevaluate this key policy statement. On the basis of the comments received, and the discussions that ensued, the joint committee felt the preferable approach was to formulate interpretations of the 1940 *Statement* from the experience gained in implementing and applying it for over thirty years and of adapting it to current needs.

The committee submitted to the two associations for their consideration *Interpretive Comments* that are included below as footnotes to the 1940 *Statement*.[1] These interpretations were adopted by the Council of the American Association of University Professors in April 1970 and endorsed by the Fifty-Sixth Annual Meeting as Association policy.

---

1. The Introduction to the Interpretive Comments notes: In the thirty years since their promulgation, the principles of the 1940 "Statement of Principles on Academic Freedom and Tenure" have undergone a substantial amount of refinement. This has evolved through a variety of processes, including customary acceptance, understandings mutually arrived at between institutions and professors or their representatives, investigations and reports by the American Association of University Professors, and formulations of statements by that association either alone or in conjunction with the Association of American

The purpose of this statement is to promote public understanding and support of academic freedom and tenure and agreement upon procedures to ensure them in colleges and universities. Institutions of higher education are conducted for the common good and not to further the interest of either the individual teacher or the institution as a whole.[2] The common good depends upon the free search for truth and its free exposition.

Academic freedom is essential to these purposes and applies to both teaching and research. Freedom in research is fundamental to the advancement of truth. Academic freedom in its teaching aspect is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning. It carries with it duties correlative with rights.[3]

Tenure is a means to certain ends; specifically: (1) freedom of teaching and research and of extramural activities, and (2) a sufficient degree of economic security to make the profession

---

Colleges. These comments represent the attempt of the two associations, as the original sponsors of the 1940 "Statement," to formulate the most important of these refinements. Their incorporation here as Interpretive Comments is based upon the premise that the 1940 "Statement" is not a static code but a fundamental document designed to set a framework of norms to guide adaptations to changing times and circumstances.

Also, there have been relevant developments in the law itself reflecting a growing insistence by the courts on due process within the academic community which parallels the essential concepts of the 1940 "Statement"; particularly relevant is the identification by the Supreme Court of academic freedom as a right protected by the First Amendment. As the Supreme Court said in *Keyishian v. Board of Regents*, 385 US 589 (1967), "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."

2. The word "teacher" as used in this document is understood to include the investigator who is attached to an academic institution without teaching duties.

3. First 1970 comment: The Association of American Colleges and the American Association of University Professors have long recognized that membership in the academic profession carries with it special responsibilities. Both associations either separately or jointly have consistently affirmed these responsibilities in major policy statements, providing guidance to professors in their utterances as citizens, in the exercise of their responsibilities to the institution and to students, and in their conduct when resigning from their institution or when undertaking government-sponsored research. Of particular relevance is the "Statement on Professional Ethics" adopted in 1966 as Association policy (AAUP, *Policy Documents and Reports*, 11th ed. [Baltimore: Johns Hopkins University Press, 2015], 145–46).

attractive to men and women of ability. Freedom and economic security, hence, tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society.

## Academic Freedom

1. Teachers are entitled to full freedom in research and in the publication of the results, subject to the adequate performance of their other academic duties; but research for pecuniary return should be based upon an understanding with the authorities of the institution.

2. Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching controversial matter which has no relation to their subject.[4] Limitations of academic freedom because of religious or other aims of the institution should be clearly stated in writing at the time of the appointment.[5]

3. College and university teachers are citizens, members of a learned profession, and officers of an educational institution. When they speak or write as citizens, they should be free from institutional censorship or discipline, but their special position in the community imposes special obligations. As scholars and educational officers, they should remember that the public may judge their profession and their institution by their utterances. Hence they should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that they are not speaking for the institution.[6]

---

4. Second 1970 comment: The intent of this statement is not to discourage what is "controversial." Controversy is at the heart of the free academic inquiry which the entire statement is designed to foster. The passage serves to underscore the need for teachers to avoid persistently intruding material which has no relation to their subject.

5. Third 1970 comment: Most church-related institutions no longer need or desire the departure from the principle of academic freedom implied in the 1940 "Statement," and we do not now endorse such a departure.

6. Fourth 1970 comment: This paragraph is the subject of an interpretation adopted by the sponsors of the 1940 "Statement" immediately following its endorsement:

> If the administration of a college or university feels that a teacher has not observed the admonitions of paragraph 3 of the section on Academic Freedom and believes that the extramural utterances of the teacher have been such as to raise grave doubts concerning the teacher's fitness for his or her position, it may proceed to file charges under paragraph 4 of the section on Academic Tenure. In pressing such charges, the administration should remember that teachers are citizens and should be

## Academic Tenure

After the expiration of a probationary period, teachers or investigators should have permanent or continuous tenure, and their service should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies.

In the interpretation of this principle it is understood that the following represents acceptable academic practice:

1. The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated.
2. Beginning with appointment to the rank of full-time instructor or a higher rank,[7] the probationary period should not exceed seven years, including within this period full-time service in all institutions of higher education; but subject to the proviso that when, after a term of probationary service of more than three years in one or more institutions, a teacher is called to another institution, it may be agreed in writing that the new appointment is for a probationary period of not more than four years, even though thereby the person's total probationary period in the academic profession is extended beyond the normal maximum of seven years.[8] Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period.[9]

----

accorded the freedom of citizens. In such cases the administration must assume full responsibility, and the American Association of University Professors and the Association of American Colleges are free to make an investigation.

Paragraph 3 of the section on Academic Freedom in the 1940 "Statement" should also be interpreted in keeping with the 1964 "Committee A Statement on Extramural Utterances," *Policy Documents and Reports,* 31, which states inter alia: "The controlling principle is that a faculty member's expression of opinion as a citizen cannot constitute grounds for dismissal unless it clearly demonstrates the faculty member's unfitness for his or her position. Extramural utterances rarely bear upon the faculty member's fitness for the position. Moreover, a final decision should take into account the faculty member's entire record as a teacher and scholar."

Paragraph 5 of the "Statement on Professional Ethics," *Policy Documents and Reports,* 146, also addresses the nature of the "special obligations" of the teacher:

As members of their community, professors have the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college or university. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

Both the protection of academic freedom and the requirements of academic responsibility apply not only to the full-time probationary and the tenured faculty, but also to all others, such as part-time faculty and teaching assistants, who exercise teaching responsibilities.

7. Fifth 1970 comment: The concept of "rank of full-time instructor or a higher rank" is intended to include any person who teaches a full-time load regardless of the teacher's specific title. [For a discussion of this question, see the "Report of the Special Committee on Academic Personnel Ineligible for Tenure," *AAUP Bulletin* 52 (September 1966): 280–82.]

8. Sixth 1970 comment: In calling for an agreement "in writing" on the amount of credit given for a faculty member's prior service at other institutions, the "Statement" furthers the general policy of full understanding by the professor of the terms and conditions of the appointment. It does not necessarily follow that a professor's tenure rights have been violated because of the absence of a written agreement on this matter. Nonetheless, especially because of the variation in permissible institutional practices, a written understanding concerning these matters at the time of appointment is particularly appropriate and advantageous to both the individual and the institution. [For a more detailed statement on this question, see "On Crediting Prior Service Elsewhere as Part of the Probationary Period," *Policy Documents and Reports,* 167–68.]

9. Seventh 1970 comment: The effect of this subparagraph is that a decision on tenure, favorable or unfavorable, must be made at least twelve months prior to the completion of the probationary period. If the decision is negative, the appointment for the following year becomes a terminal one. If the decision is affirmative, the provisions in the 1940 "Statement" with respect to the termination of service of teachers or investigators after the expiration of a probationary period should apply from the date when the favorable decision is made.

The general principle of notice contained in this paragraph is developed with greater specificity in the "Standards for Notice of Nonreappointment," endorsed by the Fiftieth Annual Meeting of the American Association of University Professors (1964) (*Policy Documents and Reports,* 99). These standards are:

Notice of nonreappointment, or of intention not to recommend reappointment to the governing board, should be given in writing in accordance with the following standards:

1. *Not later than March 1 of the first academic year of service,* if the appointment expires at the end of that year; or, if a one-year appointment terminates during an academic year, at least three months in advance of its termination.

3. During the probationary period a teacher should have the academic freedom that all other members of the faculty have.[10]

4. Termination for cause of a continuous appointment, or the dismissal for cause of a teacher previous to the expiration of a term appointment, should, if possible, be considered by both a faculty committee and the governing board of the institution. In all cases where the facts are in dispute, the accused teacher should be informed before the hearing in writing of the charges and should have the opportunity to be heard in his or her own defense by all bodies that pass judgment upon the case. The teacher should be permitted to be accompanied by an advisor of his or her own choosing who may act as counsel. There should be a full stenographic record of the hearing available to the parties concerned. In the hearing of charges of incompetence the testimony should include that of teachers and other scholars, either from the teacher's own or from other institutions. Teachers on continuous appointment who are dismissed for reasons not involving moral turpitude should receive their salaries for at least a year from the date of notification of dismissal whether or not they are continued in their duties at the institution.[11]

2. *Not later than December 15 of the second academic year of service,* if the appointment expires at the end of that year; or, if an initial two-year appointment terminates during an academic year, at least six months in advance of its termination.

3. At least twelve months before the expiration of an appointment after two or more years in the institution.

Other obligations, both of institutions and of individuals, are described in the "Statement on Recruitment and Resignation of Faculty Members," *Policy Documents and Reports*, 153–54, as endorsed by the Association of American Colleges and the American Association of University Professors in 1961.

10. Eighth 1970 comment: The freedom of probationary teachers is enhanced by the establishment of a regular procedure for the periodic evaluation and assessment of the teacher's academic performance during probationary status. Provision should be made for regularized procedures for the consideration of complaints by probationary teachers that their academic freedom has been violated. One suggested procedure to serve these purposes is contained in the "Recommended Institutional Regulations on Academic Freedom and Tenure," *Policy Documents and Reports*, 79–90, prepared by the American Association of University Professors.

11. Ninth 1970 comment: A further specification of the academic due process to which the teacher is entitled under this paragraph is contained in the "Statement on Procedural Standards in Faculty Dismissal Proceedings," *Policy Documents and Reports*, 91–93, jointly approved by the

5. Termination of a continuous appointment because of financial exigency should be demonstrably bona fide.

## Endorsers

Note: Groups that changed names subsequent to endorsing the statement are listed under their current names.

Association of American Colleges and
    Universities....................................................1941
American Association of University
    Professors.......................................................1941
American Library Association (adapted for
    librarians)......................................................1946
Association of American Law Schools.............1946
American Political Science Association ...........1947
American Association for Higher
    Education and Accreditation.......................1950
American Association of Colleges for
    Teacher Education.........................................1950
Eastern Psychological Association ...................1950
Southern Society for Philosophy and
    Psychology....................................................1953
American Psychological Association ...............1961
American Historical Association......................1961
Modern Language Association.........................1962
American Economic Association .....................1962
Agricultural and Applied Economic
    Association....................................................1962
Midwest Sociological Society ..........................1963
Organization of American Historians.............1963
Society for Classical Studies............................1963
American Council of Learned Societies...........1963
American Sociological Association ..................1963

American Association of University Professors and the Association of American Colleges in 1958. This interpretive document deals with the issue of suspension, about which the 1940 "Statement" is silent.

The "Statement on Procedural Standards in Faculty Dismissal Proceedings" provides: "Suspension of the faculty member during the proceedings is justified only if immediate harm to the faculty member or others is threatened by the faculty member's continuance. Unless legal considerations forbid, any such suspension should be with pay." A suspension which is not followed by either reinstatement or the opportunity for a hearing is in effect a summary dismissal in violation of academic due process.

The concept of "moral turpitude" identifies the exceptional case in which the professor may be denied a year's teaching or pay in whole or in part. The statement applies to that kind of behavior which goes beyond simply warranting discharge and is so utterly blameworthy as to make it inappropriate to require the offering of a year's teaching or pay. The standard is not that the moral sensibilities of persons in the particular community have been affronted. The standard is behavior that would evoke condemnation by the academic community generally.

Southern Historical Association ......................1963
American Studies Association...........................1963
Association of American Geographers ............1963
Southern Economic Association......................1963
Classical Association of the Middle West
    and South...............................................1964
Southwestern Social Science Association........1964
Archaeological Institute of America ...............1964
Southern Management Association.................1964
American Theatre Association
    (now dissolved) .............................................1964
South Central Modern Language
    Association.................................................1964
Southwestern Philosophical Society...............1964
Council of Independent Colleges......................1965
Mathematical Association of America.............1965
Arizona-Nevada Academy of Science .............1965
American Risk and Insurance Association ......1965
Academy of Management ..................................1965
American Catholic Historical Association.......1966
American Catholic Philosophical
    Association..................................................1966
Association for Education in Journalism
    and Mass Communication...........................1966
Western History Association ...........................1966
Mountain-Plains Philosophical Conference....1966
Society of American Archivists .......................1966
Southeastern Psychological Association..........1966
Southern States Communication
    Association....................................................1966
American Mathematical Society......................1967
Association for Slavic, East European,
    and Eurasian Studies...................................1967
College Theology Society .................................1967
Council on Social Work Education...................1967
American Association of Colleges of
    Pharmacy .......................................................1967
American Academy of Religion ........................1967
Association for the Sociology of Religion .......1967
American Society of Journalism School
    Administrators (now merged with the
    Association of Schools of Journalism
    and Mass Communication)..........................1967
John Dewey Society ..........................................1967
South Atlantic Modern Language
    Association....................................................1967
American Finance Association ..........................1967
Association for Social Economics.....................1967
Phi Beta Kappa Society ....................................1968
Society of Christian Ethics ...............................1968
American Association of Teachers
    of French .......................................................1968
Eastern Finance Association .............................1968
American Association for Chinese Studies .....1968
American Society of Plant Biologists...............1968
University Film and Video Association ...........1968
American Dialect Society .................................1968

American Speech-Language-Hearing
    Association.....................................................1968
Association of Social and Behavioral
    Scientists .......................................................1968
College English Association...............................1968
National College Physical Education
    Association for Men......................................1969
American Real Estate and Urban Economics
    Association.....................................................1969
Council for Philosophical Studies ...................1969
History of Education Society...........................1969
American Musicological Society......................1969
American Association of Teachers of
    Spanish and Portuguese..............................1969
Texas Community College Teachers
    Association.....................................................1970
College Art Association of America.................1970
Society of Professors of Education ..................1970
American Anthropological Association...........1970
Association of Theological Schools .................1970
Association of Schools of Journalism and
    Mass Communication...................................1971
Academy of Legal Studies in Business.............1971
Americans for the Arts .....................................1972
New York State Mathematics Association
    of Two-Year Colleges....................................1972
College Language Association...........................1973
Pennsylvania Historical Association................1973
American Philosophical Association................1974
American Classical League ...............................1974
American Comparative Literature
    Association.....................................................1974
Rocky Mountain Modern Language
    Association.....................................................1974
Society of Architectural Historians.................1975
American Statistical Association......................1975
American Folklore Society ...............................1975
Association for Asian Studies...........................1975
Linguistic Society of America .........................1975
African Studies Association .............................1975
American Institute of Biological Sciences .......1975
North American Conference on British
    Studies............................................................1975
Sixteenth-Century Society and Conference ...1975
Texas Association of College Teachers.............1976
Association for Jewish Studies .........................1976
Association for Spanish and Portuguese
    Historical Studies.........................................1976
Western States Communication Association.....1976
Texas Association of Colleges for Teacher
    Education........................................................1977
Metaphysical Society of America....................1977
American Chemical Society ..............................1977
Texas Library Association.................................1977
American Society for Legal History.................1977
Iowa Higher Education Association .................1977
American Physical Therapy Association .........1979

North Central Sociological Association...........1980
Dante Society of America .................................1980
Association for Communication
      Administration.............................................1981
National Communication Association.............1981
American Association of Physics Teachers......1982
Middle East Studies Association ......................1982
National Education Association........................1985
American Institute of Chemists.......................1985
American Association of Teachers
      of German.....................................................1985
American Association of Teachers of Italian...1985
American Association for Applied
      Linguistics.....................................................1986
American Association for Cancer Education...1986
American Society of Church History..............1986
Oral History Association...................................1987
Society for French Historical Studies ..............1987
History of Science Society.................................1987
American Association of Pharmaceutical
      Scientists........................................................1988
American Association for Clinical
      Chemistry......................................................1988
Council for Chemical Research ........................1988
Association for the Study of Higher
      Education.......................................................1988
American Psychological Association ...............1989
Association for Psychological Science..............1989
University and College Labor Education
      Association.....................................................1989
Society for Neuroscience ..................................1989
Renaissance Society of America.......................1989
Society of Biblical Literature ............................1989
National Science Teachers Association ............1989
Medieval Academy of America ........................1990
American Society of Agronomy ......................1990
Crop Science Society of America .....................1990
Soil Science Society of America........................1990
International Society of Protistologists...........1990
Society for Ethnomusicology ...........................1990
American Association of Physicists
      in Medicine...................................................1990
Animal Behavior Society...................................1990
Illinois Community College Faculty
      Association.....................................................1990
American Society for Theatre Research...........1990
National Council of Teachers of English..........1991
Latin American Studies Association................1992
Society for Cinema and Media Studies...........1992
American Society for Eighteenth-Century
      Studies...........................................................1992
Council of Colleges of Arts and Sciences........1992
American Society for Aesthetics.......................1992
Association for the Advancement
      of Baltic Studies............................................1994
American Council of Teachers of Russian.......1994

Council of Teachers of Southeast
      Asian Languages ..........................................1994
American Association of Teachers of Arabic...1994
American Association of Teachers of
      Japanese........................................................1994
Academic Senate for California
      Community Colleges...................................1996
National Council for the Social Studies...........1996
Council of Academic Programs in
      Communication Sciences and Disorders ....1996
Association for Women in Mathematics .........1997
Philosophy of Time Society...............................1998
World Communication Association.................1999
The Historical Society.......................................1999
Association for Theatre in Higher Education..1999
National Association for Ethnic Studies..........1999
Association of Ancient Historians ...................1999
American Culture Association..........................1999
American Conference for Irish Studies ...........1999
Society for Philosophy in the
      Contemporary World...................................1999
Eastern Communication Association...............1999
Association for Canadian Studies
      in the United States......................................1999
American Association for the History of
      Medicine....................................................... 2000
Missouri Association of Faculty Senates........ 2000
Association for Symbolic Logic ....................... 2000
American Society of Criminology...................2001
American Jewish Historical Society ................2001
New England Historical Association ...............2001
Society for the Scientific Study of Religion ....2001
Society for German-American Studies ...........2001
Society for Historians of the Gilded Age
      and Progressive Era.......................................2001
Eastern Sociological Society .............................2001
Chinese Historians in the United States..........2001
Community College Humanities
      Association.....................................................2002
Immigration and Ethnic History Society........2002
Society for Early Modern Catholic Studies.....2002
Academic Senate of the California State
      University ..................................................... 2004
Agricultural History Society .......................... 2004
National Council for Accreditation
      of Teacher Education ................................... 2005
American Council on the Teaching
      of Foreign Languages.................................. 2005
Society for the Study of Social Biology.......... 2005
Society for the Study of Social Problems ....... 2005
Association of Black Sociologists.................... 2005
Dictionary Society of North America ........... 2005
Society for Buddhist-Christian Studies.......... 2005
Society for Armenian Studies......................... 2006
Society for the Advancement of
      Scandinavian Study ................................... 2006

American Physiological Society ...................... 2006
National Women's Studies Association .......... 2006
National Coalition for History ........................ 2006
Society for Military History ........................... 2006
Society for Industrial and Applied
 Mathematics ................................................ 2006
Association for Research on Ethnicity and
 Nationalism in the Americas ..................... 2006
Society of Dance History Scholars.................. 2006
Association of Literary Scholars, Critics,
 and Writers .................................................. 2006
National Council on Public History............... 2006
College Forum of the National Council of
 Teachers of English...................................... 2006
Society for Music Theory ................................ 2006
Society for Historians of American
 Foreign Relations......................................... 2006
Law and Society Association ........................... 2006
Society for Applied Anthropology.................. 2006
American Society of Plant Taxonomists......... 2006
Society for the History of Technology ........... 2006
German Studies Association............................ 2006
Association of College and Research
 Libraries .......................................................2007
Czechoslovak Studies Association...................2007
American Educational Studies Association .....2007
Southeastern Women's Studies Association .. 2009
American Academy for Jewish Research.........2014
American Association for Ukrainian
 Studies...........................................................2014
American Association of Italian Studies .........2014
American Theatre and Drama Society ...........2014
Central European History Society...................2014
Central States Communication Association....2014

Chinese Language Teachers Association .........2014
Coordinating Council for Women
 in History.......................................................2014
Ecological Society of America .........................2014
Institute for American Religious and
 Philosophical Thought.................................2014
Italian American Studies Association..............2014
Midwestern Psychological Association............2014
Modern Greek Studies Association..................2014
National Association of Professors
 of Hebrew......................................................2014
National Council of Less Commonly
 Taught Languages ........................................2014
Population Association of America..................2014
Society for Italian Historical Studies..............2014
Society for Psychophysiological Research ......2014
Society for Romanian Studies..........................2014
Society for Textual Scholarship.......................2014
Society for the History of Children and
 Youth.............................................................2014
Society for the Psychological Study
 of Social Issues.............................................2014
Society for the Study of the Multi-Ethnic
 Literature of the United States....................2014
Society of Civil War Historians......................2014
Society of Mathematical Psychology..............2014
Sociologists for Women in Society .................2014
Urban History Association ..............................2014
World History Association ..............................2014
American Educational Research
 Association.....................................................2014
Labor and Working-Class History
 Association.....................................................2014
Paleontological Society ....................................2014

19

# Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments

The statement that follows, a revision of a statement originally adopted in 1971, was approved by the Association's Committee A on Academic Freedom and Tenure, adopted by the Association's Council in November 1989, and endorsed by the Seventy-Sixth Annual Meeting.

Except for special appointments clearly designated at the outset as involving only a brief association with the institution, all full-time faculty appointments are either with continuous tenure or probationary for tenure. Procedures bearing on the renewal or nonrenewal of probationary appointments are this statement's concern.

## The Probationary Period: Standards and Criteria

The 1940 *Statement of Principles on Academic Freedom and Tenure* prescribes that "during the probationary period a teacher should have the academic freedom that all other members of the faculty have." The Association's *Recommended Institutional Regulations on Academic Freedom and Tenure*[1] prescribe further that "all members of the faculty, whether tenured or not, are entitled to protection against illegal or unconstitutional discrimination by the institution, or discrimination on a basis not demonstrably related to the faculty member's professional performance. . . ." A number of the rights of nontenured faculty members provide support for their academic freedom and protection against improper discrimination. They cannot, for example, be dismissed before the end of a term appointment except for adequate cause that has been demonstrated through academic due process—a right they share with tenured members of the faculty. If they assert that they have been given notice of nonreappointment in violation of academic freedom or because of improper discrimination, they are entitled to an opportunity to establish their claim in accordance with Regulation 10 of the *Recommended Institutional Regulations.* They are entitled to timely notice of nonreappointment in accordance with the schedule prescribed in the statement on *Standards for Notice of Nonreappointment.*[2] Lacking the reinforcement of tenure, however, academic freedom and protection against improper

discrimination for probationary faculty members have depended primarily upon the understanding and support of their tenured colleagues, the administration, and professional organizations, especially the American Association of University Professors. In the *Statement on Government of Colleges and Universities,* the Association has asserted that "faculty status and related matters are primarily a faculty responsibility; this area includes appointments, reappointments, decisions not to reappoint, promotions, the granting of tenure, and dismissal." Collegial deliberation of the kind envisioned by the S*tatement on Government* will minimize the risk of a violation of academic freedom, of improper discrimination, and of a decision that is arbitrary or based on inadequate consideration.

Frequently, young faculty members have had no training or experience in teaching, and their first major research endeavor may still be uncompleted at the time they start their careers as college teachers. Under these circumstances, it is particularly important that there be a probationary period—a maximum of seven years under the 1940 *Statement of Principles on Academic Freedom and Tenure*—before tenure is granted. Such a period gives probationary faculty members time to prove themselves, and their colleagues time to observe and evaluate them on the basis of their performance in the position rather than on the basis only of their education, training, and recommendations.

Good practice requires that the institution (department, college, or university) define its criteria for reappointment and tenure and its procedures for reaching decisions on these matters. The 1940 *Statement of Principles* prescribes that "the precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated."

94

Moreover, fairness to probationary faculty members prescribes that they be informed, early in their appointments, of the substantive and procedural standards that will be followed in determining whether or not their appointments will be renewed or tenure will be granted.

The Association accordingly recommends:

1. *Criteria and Notice of Standards*
   Probationary faculty members should be advised, early in their appointment, of the substantive and procedural standards generally accepted in decisions affecting renewal and tenure. Any special standards adopted by their particular departments or schools should also be brought to their attention.

## The Probationary Period: Evaluation and Decision

The relationship of the senior and junior faculty should be one of colleagueship, even though nontenured faculty members know that in time they will be judged by their senior colleagues. Thus the procedures adopted for evaluation and possible notification of nonrenewal should not endanger this relationship where it exists, and should encourage it where it does not. Nontenured faculty members should have available to them the advice and assistance of their senior colleagues; and the ability of senior colleagues to make a sound decision on renewal or tenure will be enhanced if an opportunity is provided for a regular review of the candidate's qualifications. A conjunction of the roles in counseling and evaluation may be productive: for example, an evaluation, whether interim or at the time of final determination of renewal or tenure, should be presented in such a manner as to assist nontenured faculty members as they strive to improve their performance.

Any recommendation regarding renewal or tenure should be reached by an appropriate faculty group in accordance with procedures approved by the faculty. Because it is important to both the faculty member and the decision-making body that all significant information be considered, the candidate should be notified that a decision is to be made regarding renewal of appointment or the granting of tenure and should be afforded an opportunity to submit material that the candidate believes to be relevant to the decision.

The Association accordingly recommends:

2. a. *Periodic Review*
   There should be provision for periodic review of a faculty member's situation during the probationary service.

b. *Opportunity to Submit Material*
   Probationary faculty members should be advised of the time when decisions affecting renewal and tenure are ordinarily made, and they should be given the opportunity to submit material that they believe will be helpful to an adequate consideration of their circumstances.

Observance of the practices and procedures outlined above should minimize the likelihood of reasonable complaint if nontenured faculty members are given notice of nonreappointment. They will have been informed of the criteria and procedures for renewal and tenure; they will have been counseled by faculty colleagues; they will have been given an opportunity to have all material relevant to their evaluation considered; and they will have a timely decision representing the views of faculty colleagues.

## Notice of Reasons

Since 1971 it has been the Association's position, reached after careful examination of advantages and disadvantages, that nontenured faculty members notified of nonreappointment should, upon request, receive a statement of the reasons for the decision. In reaching this position, the Association considered the needs both of the institution and of the individual faculty member.

A major responsibility of the institution is to recruit and retain the best-qualified faculty within its goals and means. In a matter of such fundamental importance, the institution, through the appropriate faculty agencies, must be accorded the widest latitude consistent with academic freedom, equal opportunity, and the standards of fairness. The Association recognized that the requirement of giving reasons could lead, however erroneously, to an expectation that the decision-making body must justify its decision. A notice of nonreappointment could thus become confused with dismissal for cause, and under these circumstances the decision-making body could become reluctant to reach adverse decisions that might culminate in grievance procedures. As a result there was some risk that the important distinction between tenure and probation would be eroded.

Weighed against these important institutional concerns, however, were the interests of the individual faculty members. They could be honestly unaware of the reasons for a negative decision, and the decision could be based on a judgment of shortcomings which they could easily remedy if informed of them. A decision not to renew an appointment could be based on erroneous information which the faculty member could

readily correct if informed of the basis for the decision. Again, the decision could be based on considerations of institutional policy or program development that have nothing to do with the faculty member's professional competence, and if not informed of the reasons, the faculty member could mistakenly assume that a judgment of inadequate performance has been made. In the face of a persistent refusal to supply the reasons, a faculty member may be more inclined to attribute improper motivations to the decision-making body or to conclude that its evaluation has been based upon inadequate consideration. If the faculty member wished to request a reconsideration of the decision, or a review by another body, ignorance of the reasons for the decision would create difficulties both in reaching a decision whether to initiate such a request and in presenting a case for reconsideration or review.

The Association's extensive experience with specific cases since 1971 has confirmed its conclusion that the reasons in support of the faculty member's right to be informed outweigh the countervailing risks. Every notice of nonreappointment, however, need not be accompanied by a written statement of the reasons for nonreappointment. It may not always be to the advantage of the faculty member to be informed of the reasons for nonreappointment, particularly in writing. The faculty member may be placed under obligation to divulge them to the appointing body of another institution if it inquired. Similarly, a written record is likely to become the basis for continuing responses by the faculty member's former institution to prospective appointing bodies.

At many institutions, moreover, the procedures of evaluation and decision may make it difficult, if not impossible, to compile a statement of reasons that precisely reflects the basis of the decision. When a number of faculty members participate in the decision, they may oppose a reappointment for a variety of reasons, few or none of which may represent a majority view. To include every reason, no matter how few have held it, in a written statement to the faculty member may misrepresent the general view and damage unnecessarily both the morale and the professional future of the faculty member.

In many situations, of course, a decision not to reappoint will not reflect adversely upon the faculty member. An institution may, for example, find it necessary for financial or other reasons to restrict its offerings in a given department. The acquisition of tenure may depend not only upon satisfactory performance but also upon a long-term opening. Nonrenewal in these cases does not suggest a serious adverse judgment. In these situations, providing a statement of reasons, either written or oral, should pose no difficulty, and such a statement may in fact assist the faculty member in searching for a new position.

Should the faculty member, after weighing the considerations cited above, decide to request the reasons for the decision against reappointment, the reasons should be given. The faculty member also should have the opportunity to request a reconsideration by the decision-making body.

The Association accordingly recommends:

3. *Notice of Reasons*
   In the event of a decision not to renew an appointment, the faculty member should be informed of the decision in writing, and, upon request, be advised of the reasons which contributed to that decision. The faculty member should also have the opportunity to request a reconsideration by the body or individual that made the decision.

**Written Reasons**

Having been given orally the reasons that contributed to the decision against reappointment, the faculty member, to avoid misunderstanding, may request that they be confirmed in writing. The faculty member may wish to petition the appropriate faculty committee, in accordance with Regulation 10 of the Association's *Recommended Institutional Regulations*, to consider an allegation that the reasons given, or other reasons that were not stated, constitute a violation of academic freedom or improper discrimination. The faculty member may wish to petition a committee, in accordance with Regulation 16 of the *Recommended Institutional Regulations*, to consider a complaint that the decision resulted from inadequate consideration and was therefore unfair. The faculty member may believe that a written statement of reasons might be useful in pursuing a professional career.

If the department chair or other appropriate institutional officer to whom the request is made believes that confirming the oral statement in writing may be damaging to the faculty member on grounds such as those cited earlier in this statement, it would be desirable for that officer to explain the possible adverse consequences of confirming the oral statement in writing. If, in spite of this explanation, the faculty member continues to request a written statement, the request should be honored.

The Association accordingly recommends:

4. *Written Reasons*
   If the faculty member expresses a desire to petition the grievance committee (such as is

described in Regulations 10 and 16 of the Association's *Recommended Institutional Regulations*), or any other appropriate committee, to use its good offices of inquiry, recommendation, and report, or if the request is made for any other reason satisfactory to the faculty member alone, the reasons given in explanation of the nonrenewal should be confirmed in writing.

## Review Procedures: Allegations of Violation of Academic Freedom or of Discrimination

The best safeguard against a proliferation of grievance petitions on a given campus is the observance of sound principles and procedures of academic freedom and tenure and of institutional government. Observance of the procedures recommended in this statement—procedures that would provide guidance to nontenured faculty members, help assure them of a fair professional evaluation, and enlighten them concerning the reasons contributing to key decisions of their colleagues—should contribute to the achievement of harmonious faculty relationships and the development of well-qualified faculties.

Even with the best practices and procedures, however, faculty members will at times think that they have been improperly or unjustly treated and may wish another faculty group to review a decision of the faculty body immediately involved. The Association believes that fairness to both the individual and the institution requires that the institution provide for such a review when it is requested. The possibility of a violation of academic freedom or of improper discrimination is of vital concern to the institution as a whole, and where either is alleged it is of cardinal importance to the faculty and the administration to determine whether substantial grounds for the allegation exist. The institution should also be concerned to see that decisions respecting reappointment are based upon adequate consideration, and provision should thus be made for a review of allegations by affected faculty members that the consideration has been inadequate.

Because of the broader significance of a violation of academic freedom or of improper discrimination, the Association believes that the procedures to be followed in these two kinds of complaints should be kept separate from a complaint over adequacy of consideration. Regulation 10 of the *Recommended Institutional Regulations* provides a specific procedure for the review of complaints of academic freedom violation or of discrimination:[3]

If a faculty member on probationary or other nontenured appointment alleges that a decision against reappointment was based significantly on considerations that violate (1) academic freedom or (2) governing policies on making appointments without prejudice with respect to race, sex, religion, national origin, age, disability, marital status, or sexual orientation, the allegation will be given preliminary consideration by the [insert name of committee], which will seek to settle the matter by informal methods. The allegation will be accompanied by a statement that the faculty member agrees to the presentation, for the consideration of the faculty committee, of such reasons and evidence as the institution may allege in support of its decision. If the difficulty is unresolved at this stage, and if the committee so recommends, the matter will be heard in the manner set forth in Regulations 5 and 6, except that the faculty member making the complaint is responsible for stating the grounds upon which the allegations are based, and the burden of proof will rest upon the faculty member. If the faculty member succeeds in establishing a prima facie case, it is incumbent upon those who made the decision against reappointment to come forward with evidence in support of their decision. Statistical evidence of improper discrimination may be used in establishing a prima facie case.

The Association accordingly recommends:

5. *Petition for Review Alleging an Academic Freedom Violation or Improper Discrimination* Insofar as the petition for review alleges a violation of academic freedom or improper discrimination, the functions of the committee that reviews the faculty member's petition should be the following:
   a. to determine whether or not the notice of nonreappointment constitutes on its face a violation of academic freedom or improper discrimination;
   b. to seek to settle the matter by informal methods;
   c. if the matter remains unresolved, to decide whether or not the evidence submitted in support of the petition warrants a recommendation that a formal proceeding be conducted in accordance with Regulations 5 and 6 of the *Recommended Institutional Regulations*, with the burden of proof resting upon the complaining faculty member.

## Review Procedures: Allegations of Inadequate Consideration

Complaints of inadequate consideration are likely to relate to matters of professional judgment,

where the department or departmental agency should have primary authority. For this reason, the basic functions of the review committee should be to determine whether the appropriate faculty body gave adequate consideration to the faculty member's candidacy in reaching its decision and, if the review committee determines otherwise, to request reconsideration by that body.

It is easier to state what the standard "adequate consideration" does not mean than to specify in detail what it does. It does not mean that the review committee should substitute its own judgment for that of members of the department on the merits of whether the candidate should be reappointed or given tenure.[4] The conscientious judgment of the candidate's departmental colleagues must prevail if the invaluable tradition of departmental autonomy in professional judgments is to prevail. The term "adequate consideration" refers essentially to procedural rather than to substantive issues: Was the decision conscientiously arrived at? Was all available evidence bearing on the relevant performance of the candidate sought out and considered? Was there adequate deliberation by the department over the import of the evidence in light of the relevant standards? Were irrelevant and improper standards excluded from consideration? Was the decision a bona fide exercise of professional academic judgment? These are the kinds of questions suggested by the standard "adequate consideration."

If, in applying this standard, the review committee concludes that adequate consideration was not given, its appropriate response should be to recommend to the department that it assess the merits once again, this time remedying the inadequacies of its prior consideration.

An acceptable review procedure, representing one procedural system within which such judgments may be made, is outlined in Regulation 16 of the *Recommended Institutional Regulations,* as follows:

> If any faculty member alleges cause for grievance in any matter not covered by the procedures described in the foregoing regulations, the faculty member may petition the elected faculty grievance committee [here name the committee] for redress. The petition will set forth in detail the nature of the grievance and will state against whom the grievance is directed. It will contain any factual or other data which the petitioner deems pertinent to the case. Statistical evidence of improper discrimination, including discrimination in salary, may be used in establishing a prima facie case. The committee will decide whether or not the facts merit a detailed investigation; if the faculty member succeeds in establishing a prima facie case, it is incumbent upon those who made the decision to come forward with evidence in support of their decision. Submission of a petition will not automatically entail investigation or detailed consideration thereof. The committee may seek to bring about a settlement of the issue satisfactory to the parties. If in the opinion of the committee such a settlement is not possible or is not appropriate, the committee will report its findings and recommendations to the petitioner and to the appropriate administrative officer and faculty body, and the petitioner will, upon request, be provided an opportunity to present the grievance to them. The grievance committee will consist of three [or some other number] elected members of the faculty. No officer of administration will serve on the committee.

The Association accordingly recommends:

6. *Petition for Review Alleging Inadequate Consideration*
   Insofar as the petition for review alleges inadequate consideration, the functions of the committee which reviews the faculty member's petition should be the following:
   a. to determine whether the decision was the result of adequate consideration, with the understanding that the review committee should not substitute its judgment on the merits for that of the body or individual that made the decision;
   b. to request reconsideration by the faculty body when the committee believes that adequate consideration was not given to the faculty member's qualifications (in such instances, the committee should indicate the respects in which it believes that consideration may have been inadequate); and
   c. to provide copies of its report and recommendation to the faculty member, the body or individual that made the decision, and the president or other appropriate administrative officer.

### Notes

1. AAUP, *Policy Documents and Reports*, 11th ed. (Baltimore: Johns Hopkins University Press, 2015), 85.
2. Ibid., 99.
3. Faculties processing complaints under Regulations 10 and 16 may wish to secure the further advice of the Association's Washington office.
4. As used here, "department" may refer to any institutional body or individual responsible for making a recommendation or decision on reappointment.

# Recommended Institutional Regulations on Academic Freedom and Tenure

### (2018 REVISION)

*The* Recommended Institutional Regulations on Academic Freedom and Tenure *sets forth, in language suitable for use by an institution of higher education, rules that derive from the chief provisions and interpretations of the 1940* Statement of Principles on Academic Freedom and Tenure *and of the* Statement on Procedural Standards in Faculty Dismissal Proceedings. *The* Recommended Institutional Regulations *was first formulated by Committee A on Academic Freedom and Tenure in 1957. A revised and expanded text, approved by Committee A in 1968, reflected the development of Association standards and procedures. Texts with further revisions were approved by Committee A in 1972, 1976, 1982, 1990, 1999, 2005, 2006, 2009, 2013, and 2018. When such revisions have constituted a change in the Association's policies, they have been adopted by the Council.*

*The current text is based upon the Association's continuing experience in evaluating regulations actually in force at particular institutions. It is also based upon further definition of the standards and procedures of the Association over the years. The Association will be glad to assist in interpretation of the regulations or to consult about their incorporation in, or adaptation to, the rules of a particular college or university.*

## Foreword

These regulations are designed to enable the [named institution] to protect academic freedom and tenure and to ensure academic due process. The principles implicit in these regulations are for the benefit of all who are involved with or are affected by the policies and programs of the institution. A college or university is a marketplace of ideas, and it cannot fulfill its purposes of transmitting, evaluating, and extending knowledge if it requires conformity with any orthodoxy of content and method. In the words of the United States Supreme Court, "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

## 1. STATEMENT OF TERMS OF APPOINTMENT

a. The terms and conditions of every appointment to the faculty will be stated or confirmed in writing, and a copy of the appointment document will be supplied to the faculty member. Any subsequent extensions or modifications of an appointment, and any special understandings or any notices incumbent upon either party to provide, will be stated or confirmed in writing, and a copy will be given to the faculty member.

b. With the exception of special appointments clearly limited to a brief association with the institution, and reappointments of retired faculty members on special conditions, all full-time faculty appointments are of two kinds: (1) probationary appointments; (2) appointments with continuous tenure. All part-time faculty appointments are either (1) probationary appointments; (2) appointments with continuous tenure; or (3) other nontenured appointments.

c. Except for faculty members who have tenure status, every person with a teaching or research appointment of any kind will be informed each

*Recommended Institutional Regulations on Academic Freedom and Tenure*

year in writing of the renewal of the appointment and of all matters relative to eligibility for the acquisition of tenure.

### 2. Probationary Appointments

a. Probationary appointments may be for one year, or for other stated periods, subject to renewal. The total period of full-time service prior to the acquisition of continuous tenure will not exceed _____ years,[1] including all previous full-time service with the rank of instructor or higher in other institutions of higher learning, except that the probationary period may extend to as much as four years, even if the total full-time service in the profession thereby exceeds seven years; the terms of such extension will be stated in writing at the time of initial appointment.[2] Scholarly leave of absence for one year or less will count as part of the probationary period as if it were prior service at another institution, unless the individual and the institution agree in writing to an exception to this provision at the time the leave is granted.

b. The faculty member will be advised, at the time of initial appointment, of the substantive standards and procedures generally employed in decisions affecting renewal and tenure. Any special standards adopted by the faculty member's department or school will also be transmitted. The faculty member will be advised of the time when decisions affecting renewal or tenure are ordinarily made and will be given the opportunity to submit material believed to be helpful to an adequate consideration of the faculty member's circumstances.

c. Regardless of the stated term or other provisions of any appointments, written notice that a probationary appointment is not to be renewed will be given to the faculty member in advance of the expiration of the appointment as follows: (1) not later than March 1 of the first academic year of service if the appointment expires at the end of that year; or, if a one-year appointment terminates during an academic year, at least three months in advance of its termination; (2) not later than December 15 of the second academic year of service if the appointment expires at the end of that year; or, if an initial two-year appointment terminates during an academic

year, at least six months in advance of its termination; (3) at least twelve months before the expiration of an appointment after two or more years of service at the institution.

d. The institution will normally notify faculty members whose appointments are being renewed of the terms and conditions of their renewals by March 15, but in no case will such information be given later than _____.[3]

e. When a decision not to renew an appointment has been reached, the faculty member involved will be informed of that decision in writing by the body or individual making the decision; the faculty member will be advised upon request of the reasons which contributed to that decision. The faculty member may request a reconsideration by the body or individual making the decision.

f. If the faculty member so requests, the reasons given in explanation of the nonrenewal will be confirmed in writing.

g. Insofar as the faculty member alleges that the decision against renewal was based on inadequate consideration, the committee[4] that reviews the faculty member's allegation will determine whether the decision was the result of adequate consideration in terms of the relevant standards of the institution. The review committee will not substitute its judgment on the merits for that of the body or individual that made the decision. If the review committee believes that adequate consideration was not given to the faculty member's qualifications, it will recommend reconsideration by the body or individual that made the decision, indicating the respects in which it believes the consideration may have been inadequate. It will provide copies of its findings to the faculty member, the body or individual that made the decision, and the president or other appropriate administrative officer.

### 3. Termination of Appointment by Faculty Members

Faculty members may terminate their appointments effective at the end of an academic year, provided that they give notice in writing at the earliest possible opportunity, but not later than May 15, or thirty days after receiving notification of the terms of appointment for the coming year, whichever date occurs later.

Faculty members may properly request a waiver of this requirement of notice in case of hardship or in a situation where they would otherwise be denied substantial professional advancement or other opportunity.

#### 4. TERMINATION OF APPOINTMENTS BY THE INSTITUTION

a. Termination of an appointment with continuous tenure, or of a probationary or other nontenured appointment before the end of the specified term, may be effected by the institution only for adequate cause.

b. If termination takes the form of a dismissal for cause, it will be pursuant to the provisions specified in Regulation 5.

**Financial Exigency**[5]

c. (1) Termination of an appointment with continuous tenure, or of a probationary or other nontenured appointment before the end of the specified term, may occur under extraordinary circumstances because of a demonstrably bona fide financial exigency, i.e., a severe financial crisis that fundamentally compromises the academic integrity of the institution as a whole and that cannot be alleviated by less drastic means.

[Note: Each institution in adopting regulations on financial exigency will need to decide how to share and allocate the hard judgments and decisions that are necessary in such a crisis.

As a first step, there should be an elected faculty governance body, or a body designated by a collective bargaining agreement, that participates in the decision that a condition of financial exigency exists or is imminent and that all feasible alternatives to termination of appointments have been pursued, including expenditure of one-time money or reserves as bridge funding, furloughs, pay cuts, deferred-compensation plans, early-retirement packages, deferral of nonessential capital expenditures, and cuts to noneducational programs and services, including expenses for administration.[6]

Judgments determining where within the overall academic program termina-

tion of appointments may occur involve considerations of educational policy, including affirmative action, as well as of faculty status, and should therefore be the primary responsibility of the faculty or of an appropriate faculty body.[7] The faculty or an appropriate faculty body should also exercise primary responsibility in determining the criteria for identifying the individuals whose appointments are to be terminated. These criteria may appropriately include considerations of length of service.

The responsibility for identifying individuals whose appointments are to be terminated should be committed to a person or group designated or approved by the faculty. The allocation of this responsibility may vary according to the size and character of the institution, the extent of the terminations to be made, or other considerations of fairness in judgment. The case of a faculty member given notice of proposed termination of appointment will be governed by the following provisions.]

(2) Before any proposals for program discontinuance on grounds of financial exigency are made, the faculty or an appropriate faculty body will have opportunity to render an assessment in writing of the institution's financial condition.

[Note: Academic programs cannot be defined ad hoc, at any size; programs should be recognized academic units that existed prior to the declaration of financial exigency. The term "program" should designate a related cluster of credit-bearing courses that constitute a coherent body of study within a discipline or set of related disciplines. When feasible, the term should designate a department or similar administrative unit that offers majors and minors.]

(i) The faculty or an appropriate faculty body will have access to at least five years of audited financial statements, current and following-year budgets, and detailed cash-flow estimates for future years.

*Recommended Institutional Regulations on Academic Freedom and Tenure*

(ii)  In order to make informed recommendations about the financial impact of program closures, the faculty or an appropriate faculty body will have access to detailed program, department, and administrative-unit budgets.

(iii)  Faculty members in a program being considered for discontinuance because of financial exigency will promptly be informed of this activity in writing and provided at least thirty days in which to respond to it. Tenured, tenure-track, and contingent faculty members will be informed and invited to respond.

(3)  If the administration issues notice to a particular faculty member of an intention to terminate the appointment because of financial exigency, the faculty member will have the right to a full hearing before a faculty committee. The hearing need not conform in all respects with a proceeding conducted pursuant to Regulation 5, but the essentials of an on-the-record adjudicative hearing will be observed. The issues in this hearing may include the following:

(i)  The existence and extent of the condition of financial exigency. The burden will rest on the administration to prove the existence and extent of the condition. The findings of a faculty committee in a previous proceeding involving the same issue may be introduced.

(ii)  The validity of the educational judgments and the criteria for identification for termination; but the recommendations of a faculty body on these matters will be considered presumptively valid.

(iii)  Whether the criteria are being properly applied in the individual case.

(4)  If the institution, because of financial exigency, terminates appointments, it will not at the same time make new appointments, except in extraordinary circumstances where a serious distortion in the academic program would otherwise result. The appointment of a faculty member with tenure will not be terminated in favor of retaining a faculty member without tenure, except in extraordinary circumstances where a serious distortion of the academic program would otherwise result.

(5)  Before terminating an appointment because of financial exigency, the institution, with faculty participation, will make every effort to place the faculty member concerned in another suitable position within the institution.

(6)  In all cases of termination of appointment because of financial exigency, the faculty member concerned will be given notice or severance salary not less than as prescribed in Regulation 8.

(7)  In all cases of termination of appointment because of financial exigency, the place of the faculty member concerned will not be filled by a replacement within a period of three years, unless the released faculty member has been offered reinstatement and at least thirty days in which to accept or decline it.

### Discontinuance of Program or Department for Educational Reasons[8]

d.  Termination of an appointment with continuous tenure, or of a probationary or other nontenured appointment before the end of the specified term, may occur as a result of bona fide formal discontinuance of a program or department of instruction. The following standards and procedures will apply.

(1)  The decision to discontinue formally a program or department of instruction will be based essentially upon educational considerations, as determined primarily by the faculty as a whole or an appropriate committee thereof.

   [Note: "Educational considerations" do not include cyclical or temporary variations in enrollment. They must reflect long-range judgments that the educational mission of the institution as a whole will be enhanced by the discontinuance.]

(2)  Faculty members in a program being considered for discontinuance for educational considerations will promptly be informed of this activity in writing and provided at

least thirty days in which to respond to it. Tenured, tenure-track, and contingent faculty members will be invited to participate in these deliberations.

[Note: Academic programs cannot be defined ad hoc, at any size; programs must be recognized academic units that existed prior to the decision to discontinue them. The term "program" should designate a related cluster of credit-bearing courses that constitute a coherent body of study within a discipline or set of related disciplines. When feasible, the term should designate a department or similar administrative unit that offers majors and minors.]

(3) Before the administration issues notice to a faculty member of its intention to terminate an appointment because of formal discontinuance of a program or department of instruction, the institution will make every effort to place the faculty member concerned in another suitable position. If placement in another position would be facilitated by a reasonable period of training, financial and other support for such training will be proffered. If no position is available within the institution, with or without retraining, the faculty member's appointment then may be terminated, but only with provision for severance salary equitably adjusted to the faculty member's length of past and potential service, an amount which may well exceed but not be less than the amount prescribed in Regulation 8.

[Note: When an institution proposes to discontinue a program or department of instruction based essentially on educational considerations, it should plan to bear the costs of relocating, training, or otherwise compensating faculty members adversely affected.]

(4) A faculty member who contests a proposed relocation or termination resulting from a discontinuance has a right to a full hearing before a faculty committee. The hearing need not conform in all respects with a proceeding conducted pursuant to Regulation 5, but the essentials of an on-the-record adjudicative hearing will be observed. The issues in such a hearing may include the institution's failure to satisfy any of the conditions specified in Regulation 4d. In the hearing, a faculty determination that a program or department is to be discontinued will be considered presumptively valid, but the burden of proof on other issues will rest on the administration.

**Review**

e. In cases of termination of appointment, the governing board will be available for ultimate review.

## 5. Dismissal Procedures

a. Adequate cause for a dismissal will be related, directly and substantially, to the fitness of faculty members in their professional capacities as teachers or researchers. Dismissal will not be used to restrain faculty members in their exercise of academic freedom or other rights of American citizens.[9]

b. Dismissal of a faculty member with continuous tenure, or with a probationary or other nontenured appointment before the end of the specified term, will be preceded by (1) discussions between the faculty member and appropriate administrative officers looking toward a mutual settlement; (2) informal inquiry by the duly elected faculty committee [insert name of committee], which may, if it fails to effect an adjustment, determine whether in its opinion dismissal proceedings should be undertaken, without its opinion being binding upon the president; (3) a statement of charges, framed with reasonable particularity by the president or the president's delegate.

c. A dismissal, as defined in Regulation 5a, will be preceded by a statement of charges, and the individual concerned will have the right to be heard initially by the elected faculty hearing committee [insert name of committee].[10] Members deeming themselves disqualified for bias or interest will remove themselves from the case, either at the request of a party or on their own initiative. Each party will have a maximum of two challenges without stated cause.[11]

(1) Pending a final decision by the hearing committee, the faculty member will be suspended, or assigned to other duties in lieu of suspension, only if immediate harm

*Recommended Institutional Regulations on Academic Freedom and Tenure*

to the faculty member or others is threatened by continuance. Before suspending a faculty member, pending an ultimate determination of the faculty member's status through the institution's hearing procedures, the administration will consult with the Faculty Committee on Academic Freedom and Tenure [or whatever other title it may have] concerning the propriety, the length, and the other conditions of the suspension. A suspension that is intended to be final is a dismissal and will be treated as such. Salary will continue during the period of the suspension.

(2) The hearing committee may, with the consent of the parties concerned, hold joint prehearing meetings with the parties in order to (i) simplify the issues, (ii) effect stipulations of facts, (iii) provide for the exchange of documentary or other information, and (iv) achieve such other appropriate prehearing objectives as will make the hearing fair, effective, and expeditious.

(3) Service of notice of hearing with specific charges in writing will be made at least twenty days prior to the hearing. The faculty member may waive a hearing or may respond to the charges in writing at any time before the hearing. If the faculty member waives a hearing, but denies the charges or asserts that the charges do not support a finding of adequate cause, the hearing tribunal will evaluate all available evidence and rest its recommendation upon the evidence in the record.

(4) The committee, in consultation with the president and the faculty member, will exercise its judgment as to whether the hearing should be public or private.

(5) During the proceedings the faculty member will be permitted to have an academic adviser and counsel of the faculty member's choice.

(6) At the request of either party or the hearing committee, a representative of a responsible educational association will be permitted to attend the proceedings as an observer.

(7) A verbatim record of the hearing or hearings will be taken, and a copy will be made available to the faculty member without cost, at the faculty member's request.

(8) The burden of proof that adequate cause exists rests with the institution and will be satisfied only by clear and convincing evidence in the record considered as a whole.

(9) The hearing committee will grant adjournments to enable either party to investigate evidence as to which a valid claim of surprise is made.

(10) The faculty member will be afforded an opportunity to obtain necessary witnesses and documentary or other evidence. The administration will cooperate with the hearing committee in securing witnesses and in making available documentary and other evidence.

(11) The faculty member and the administration will have the right to confront and cross-examine all witnesses. Where the witnesses cannot or will not appear, but the committee determines that the interests of justice require admission of their statements, the committee will identify the witnesses, disclose their statements, and, if possible, provide for interrogatories.

(12) In the hearing of charges of incompetence, the testimony will include that of qualified faculty members from this or other institutions of higher education.

(13) The hearing committee will not be bound by strict rules of legal evidence and may admit any evidence which is of probative value in determining the issues involved. Every possible effort will be made to obtain the most reliable evidence available.

(14) The findings of fact and the decision will be based solely on the hearing record.

(15) Except for such simple announcements as may be required, covering the time of the hearing and similar matters, public statements and publicity about the case by either the faculty member or administrative officers will be avoided so far as possible until the proceedings have been

completed, including consideration by the governing board of the institution. The president and the faculty member will be notified of the decision in writing and will be given a copy of the record of the hearing.

(16) If the hearing committee concludes that adequate cause for dismissal has not been established by the evidence in the record, it will so report to the president. If the president rejects the report, the president will state the reasons for doing so, in writing, to the hearing committee and to the faculty member and provide an opportunity for response before transmitting the case to the governing board. If the hearing committee concludes that adequate cause for a dismissal has been established, but that an academic penalty less than dismissal would be more appropriate, it will so recommend, with supporting reasons.

## 6. ACTION BY THE GOVERNING BOARD

If dismissal or other severe sanction is recommended, the president will, on request of the faculty member, transmit to the governing board the record of the case. The governing board's review will be based on the record of the committee hearing, and it will provide opportunity for argument, oral or written or both, by the principals at the hearing or by their representatives. The decision of the hearing committee will either be sustained or the proceedings returned to the committee with specific objections. The committee will then reconsider, taking into account the stated objections and receiving new evidence, if necessary. The governing board will make a final decision only after study of the committee's reconsideration.

## 7. PROCEDURES FOR IMPOSITION OF SANCTIONS OTHER THAN DISMISSAL

a. If the administration believes that the conduct of a faculty member, although not constituting adequate cause for dismissal, is sufficiently grave to justify imposition of a severe sanction, such as suspension from service for a stated period, the administration may institute a proceeding to impose such a severe sanction; the procedures outlined in Regulation 5 will govern such a proceeding.

b. If the administration believes that the conduct of a faculty member justifies imposition of a minor sanction, such as a reprimand, it will notify the faculty member of the basis of the proposed sanction and provide the faculty member with an opportunity to persuade the administration that the proposed sanction should not be imposed. A faculty member who believes that a major sanction has been incorrectly imposed under this paragraph, or that a minor sanction has been unjustly imposed, may, pursuant to Regulation 16, petition the faculty grievance committee for such action as may be appropriate.

## 8. TERMINAL SALARY OR NOTICE

If the appointment is terminated, the faculty member will receive salary or notice in accordance with the following schedule: at least three months, if the final decision is reached by March 1 (or three months prior to the expiration) of the first year of probationary service; at least six months, if the decision is reached by December 15 of the second year (or after nine months but prior to eighteen months) of probationary service; at least one year, if the decision is reached after eighteen months of probationary service or if the faculty member has tenure.[12]

This provision for terminal notice or salary need not apply in the event that there has been a finding that the conduct which justified dismissal involved moral turpitude. On the recommendation of the faculty hearing committee or the president, the governing board, in determining what, if any, payments will be made beyond the effective date of dismissal, may take into account the length and quality of service of the faculty member.

## 9. ACADEMIC FREEDOM AND PROTECTION AGAINST DISCRIMINATION

a. All members of the faculty, whether tenured or not, are entitled to academic freedom as set forth in the 1940 *Statement of Principles on Academic Freedom and Tenure*, formulated by the Association of American Colleges and Universities and the American Association of University Professors.

b. All members of the faculty, whether tenured or not, are entitled to protection against illegal or unconstitutional discrimination by the institution, or discrimination on a basis not demonstrably related to the faculty member's

*Recommended Institutional Regulations on Academic Freedom and Tenure*

professional performance, including but not limited to race, sex, religion, national origin, age, disability, marital status, or sexual orientation.

## 10. COMPLAINTS OF VIOLATION OF ACADEMIC FREEDOM OR OF DISCRIMINATION IN NONREAPPOINTMENT

If a faculty member on probationary or other non-tenured appointment alleges that a decision against reappointment was based significantly on considerations that violate (a) academic freedom or (b) governing policies on making appointments without prejudice with respect to race, sex, religion, national origin, age, disability, marital status, or sexual orientation, the allegation will be given preliminary consideration by the [insert name of committee], which will seek to settle the matter by informal methods. The allegation will be accompanied by a statement that the faculty member agrees to the presentation, for the consideration of the faculty committee, of such reasons and evidence as the institution may allege in support of its decision. If the difficulty is unresolved at this stage and if the committee so recommends, the matter will be heard in the manner set forth in Regulations 5 and 6, except that the faculty member making the complaint is responsible for stating the grounds upon which the allegations are based and the burden of proof will rest upon the faculty member. If the faculty member succeeds in establishing a prima facie case, it is incumbent upon those who made the decision against reappointment to come forward with evidence in support of their decision. Statistical evidence of improper discrimination may be used in establishing a prima facie case.

## 11. ADMINISTRATIVE PERSONNEL

The foregoing regulations apply to administrative personnel who hold academic rank, but only in their capacity as faculty members. Administrators who allege that a consideration that violates academic freedom or governing policies against improper discrimination, as stated in Regulation 10, significantly contributed to a decision to terminate their appointment to an administrative post or not to reappoint them are entitled to the procedures set forth in Regulation 10.

## 12. POLITICAL ACTIVITIES OF FACULTY MEMBERS

Faculty members, as citizens, are free to engage in political activities. Where necessary, leaves of absence may be given for the duration of an election campaign or a term of office, on timely application, and for a reasonable period of time. The terms of such leave of absence will be set forth in writing, and the leave will not affect unfavorably the tenure status of a faculty member, except that time spent on such leave will not count as probationary service unless otherwise agreed to.[13]

## 13. PART-TIME FACULTY APPOINTMENTS[14]

a. After having been reappointed beyond an initial term, a part-time faculty member who is subsequently notified of nonreappointment will be advised upon request of the reasons that contributed to the decision. Upon the faculty member's further request, the reasons will be confirmed in writing. The faculty member will be afforded opportunity for review of the decision by a faculty committee.

b. For part-time faculty members who have served for three or more terms within a span of three years, the following additional protections of academic due process apply:

(1) Written notice of reappointment or non-reappointment will be issued no later than one month before the end of the existing appointment. If the notice of reappointment is to be conditioned, for example, on sufficiency of student enrollment or on financial considerations, the specific conditions will be stated with the issuance of the notice.

(2) When the part-time faculty member is denied reappointment to an available assignment (one with substantially identical responsibilities assigned to another part-time faculty member with less service), if the nonreappointed faculty member alleges that the decision was based on inadequate consideration, the allegation will be subject to review by a faculty body. If this body, while not providing judgment on the merits of the decision, finds that the consideration has been inadequate in any substantial respects, it will remand the matter for further consideration accordingly.[15]

c. Prior to consideration of reappointment beyond a seventh year, part-time faculty members who have taught at least twelve courses or six terms

within those seven years shall be provided a comprehensive review with the potential result of (1) appointment with part-time tenure [where such exists], (2) appointment with part-time continuing service, or (3) nonreappointment. Those appointed with tenure shall be afforded the same procedural safeguards as full-time tenured faculty. Those offered additional appointment without tenure shall have continuing appointments and shall not be replaced by part-time appointees with less service who are assigned substantially identical responsibilities without having been afforded the procedural safeguards associated with dismissal as set forth in Regulation 5.

### 14. Graduate Student Employees

a.  The length, terms, and conditions of every university appointment of a graduate student employee will be stated in writing at the time of the initial appointment. A copy of the appointment document will be supplied to the appointee.[16]

b.  The graduate student employee on recurring appointments will be advised at the time of initial appointment of the substantive standards, expectations, and procedures generally employed at the institution in decisions affecting renewal and of any special standards adopted by the graduate student employee's department or school. The graduate student employee will be advised of the time when decisions affecting renewals are made and will be given the opportunity to submit material believed to be helpful to an adequate consideration of his or her circumstances.

c.  In a case of dismissal before the end of the period of an academic or professional appointment, the graduate student employee will be provided with a statement of reasons for the action and will have the right to a pretermination hearing before a duly constituted committee. The hearing need not conform in all respects with a proceeding conducted pursuant to Regulation 5, but the essentials of an on-the-record adjudicative hearing will be observed. In such a hearing, the administration will have the burden of showing adequate cause for dismissal.[17] Adequate cause for a dismissal will be related, directly and substantially, to the fitness of the graduate student employee in his or her professional capacity

regarding teaching, research, or other academic duties. Dismissal will not be used to restrain graduate student employees in their exercise of academic freedom or constitutional rights.

d.  Written notice of reappointment or nonreappointment will be issued to graduate student academic or professional employees no later than one month before the end of the existing appointment.

e.  Graduate student academic or professional employees who are notified of nonreappointment will be advised upon request of the reasons that contributed to the decision. Upon the employee's further request, the reasons will be confirmed in writing. The employee will be afforded the opportunity for review of the decision by a duly constituted committee.

f.  In a case of nonreappointment, if a graduate student academic or professional employee establishes a prima facie case to the satisfaction of a duly constituted committee that considerations that violate academic freedom or governing policies against improper discrimination based on race, sex, national origin, age, disability, marital status, or sexual orientation significantly contributed to his or her nonretention, it is incumbent on those who made the decision to come forward with evidence in support of that decision.

g.  If a graduate student employee who is denied reappointment to an available academic or professional position alleges that the decision was based on inadequate consideration, the allegation will be subject to review by a duly constituted body.[18] If this body, while not providing judgment on the merits of the decision, finds that the consideration has been inadequate in any substantial respects, it will remand the matter, recommending to the department that it assess the merits once again, this time remedying the inadequacies of its prior consideration.[19]

h.  Graduate student academic or professional employees will have access to the faculty grievance committee, as specified in Regulation 16.

### 15. Other Academic Staff

a.  In no case will a member of the academic staff who is not otherwise protected by the preceding

*Recommended Institutional Regulations on Academic Freedom and Tenure*

regulations that relate to dismissal proceedings be dismissed without having been provided with a statement of reasons and an opportunity to be heard before a duly constituted committee.[20] (A dismissal is a termination before the end of the period of appointment.)

b. With respect to the nonreappointment of a member of such academic staff who establishes a prima facie case to the satisfaction of a duly constituted committee that considerations that violate academic freedom, or of governing policies against improper discrimination as stated in Regulation 10, significantly contributed to the nonreappointment, the academic staff member will be given a statement of reasons by those responsible for the nonreappointment and an opportunity to be heard by the committee.

## 16. Grievance Procedure

If any faculty member alleges cause for grievance in any matter not covered by the procedures described in the foregoing regulations, the faculty member may petition the elected faculty grievance committee [here name the committee] for redress. The petition will set forth in detail the nature of the grievance and will state against whom the grievance is directed. It will contain any factual or other data that the petitioner deems pertinent to the case. Statistical evidence of improper discrimination, including discrimination in salary, may be used in establishing a prima facie case. The committee will decide whether or not the facts merit a detailed investigation; if the faculty member succeeds in establishing a prima facie case, it is incumbent upon those who made the decision to come forward with evidence in support of their decision. Submission of a petition will not automatically entail investigation or detailed consideration thereof. The committee may seek to bring about a settlement of the issue(s) satisfactory to the parties. If in the opinion of the committee such a settlement is not possible or is not appropriate, the committee will report its findings and recommendations to the petitioner and to the appropriate administrative officer and faculty body, and the petitioner will, upon request, be provided an opportunity to present the grievance to them. The grievance committee will consist of three [or some other number] elected members of the faculty. No officer of the administration will serve on the committee.

## Note on Implementation

The *Recommended Institutional Regulations* here presented will require for their implementation a number of structural arrangements and agencies. For example, the *Regulations* will need support by

1. channels of communication among all the involved components of the institution and between them and a concerned faculty member;

2. definitions of corporate and individual faculty status within the college or university government and of the role of the faculty in decisions relating to academic freedom and tenure; and

3. appropriate procedures for the creation and operation of faculty committees, with particular regard to the principles of faculty authority and responsibility.

The forms which these supporting elements assume will of course vary from one institution to another. Consequently, no detailed description of the elements is attempted in the *Recommended Institutional Regulations*. With respect to the principles involved, guidance will be found in the Association's *Statement on Government of Colleges and Universities.* ∎

////////////////////////////////////////////////////////////////////////

## NOTES

1. Under the 1940 *Statement of Principles on Academic Freedom and Tenure,* this period may not exceed seven years. However, the Association's 2001 *Statement of Principles on Family Responsibilities and Academic Work* (AAUP, *Policy Documents and Reports,* 11th ed. [Baltimore: Johns Hopkins University Press, 2015], 339–46) provides that "a faculty member be entitled to stop the clock or extend the probationary period, with or without taking a full or partial leave of absence, if the faculty member (whether male or female) is a primary coequal caregiver of newborn or newly adopted children" and that "institutions allow the tenure clock to be stopped for up to one year for each child, and . . . that faculty be allowed to stop the clock only twice, resulting in no more than two one-year extensions of the probationary period."

2. The exception here noted applies only to an institution where the maximum probationary period exceeds four years.

3. April 15 is the recommended date.

4. This committee, which can be the grievance committee noted in Regulation 16, is to be an elected faculty body. Similarly, the members of the committees noted in Regulations 4c(3), 4d(4), 10, and 13 are to be elected. A committee of faculty members appointed by an elected faculty body can substitute for a committee that is elected directly.

5. See *The Role of the Faculty in Conditions of Financial Exigency,*

*Recommended Institutional Regulations on Academic Freedom and Tenure*

in *Policy Documents and Reports*, 292–308. The definition of "financial exigency" offered in that report and adopted here is intended to be more responsive to actual institutional conditions and extends the standard of exigency to situations not covered by Committee A's previous definition.

6. See *The Role of the Faculty in Budgetary and Salary Matters*, in *Policy Documents and Reports*, 289–91, especially the following passages:

> The faculty should participate both in the preparation of the total institutional budget and (within the framework of the total budget) in decisions relevant to the further apportioning of its specific fiscal divisions (salaries, academic programs, tuition, physical plant and grounds, and so on). The soundness of resulting decisions should be enhanced if an elected representative committee of the faculty participates in deciding on the overall allocation of institutional resources and the proportion to be devoted directly to the academic program. This committee should be given access to all information that it requires to perform its task effectively, and it should have the opportunity to confer periodically with representatives of the administration and governing board. . . .
>
> Circumstances of financial exigency obviously pose special problems. At institutions experiencing major threats to their continued financial support, the faculty should be informed as early and specifically as possible of significant impending financial difficulties. The faculty—with substantial representation from its nontenured as well as its tenured members, since it is the former who are likely to bear the brunt of the reduction—should participate at the department, college or professional school, and institution-wide levels in key decisions as to the future of the institution and of specific academic programs within the institution. The faculty, employing accepted standards of due process, should assume primary responsibility for determining the status of individual faculty members.

7. See *Statement on Government of Colleges and Universities*, in *Policy Documents and Reports*, 117–22, especially the following passage: "Faculty status and related matters are primarily a faculty responsibility; this area includes appointments, reappointments, decisions not to reappoint, promotions, the granting of tenure, and dismissal. The primary responsibility of the faculty for such matters is based upon the fact that its judgment is central to general educational policy."

8. When discontinuance of a program or department is mandated by financial exigency of the institution, the standards of Regulation 4c, above, will apply.

9. For cause relating to physical or mental disability, see *Accommodating Faculty Members Who Have Disabilities*, in *Policy Documents and Reports*, 374–78.

10. This committee should not be the same as the committee referred to in Regulation 5b(2).

11. Regulations of the institution should provide for alternates or for some other method of filling vacancies on the hearing committee resulting from disqualification, challenge without stated cause, illness, resignation, or other reason.

12. For renewable term appointments not specifically designated as probationary for tenure, see "The Applicability of the 'Standards for Notice of Nonreappointment' to All Full-Time Faculty on Renewable Term Appointments," in "Report of Committee A, 1994–95" (*Academe*, September–October 1995, 51–54), which states:

> While academic institutions commonly adhere to the Association's *Standards for Notice of Nonreappointment* with respect to faculty appointments that they recognize as probationary, in many cases they have not considered those standards to be applicable to those full-time faculty members whose service under non-tenure-track appointments has involved more than "a brief association with the institution" and who continue to serve on annual appointments that are indefinitely renewable at the discretion of the administration. Typically, although the terms of their appointments may stipulate that they are for one year only, the faculty members are given reason to expect that, so long as they perform creditably and so long as enough courses remain available, the appointments will be renewed. Frequently, however, at or near the end of an academic year, these individuals are suddenly notified that their appointments are not in fact being renewed for the following year. Despite what may have been an extended affiliation with the institution, the faculty members are not viewed as entitled to the notice of nonreappointment that would be given to colleagues who hold appointments designated as probationary.
>
> Committee A considers all full-time faculty members holding renewable term appointments, whatever their title or status, to be entitled to notice of nonreappointment as called for in the Association's recommended standards. We do not view it as necessary, or indeed as equitable, to deprive full-time "non-tenure-track" faculty members of the safeguards that the standards for notice are intended to provide.

13. See *Statement on Professors and Political Activity*, in *Policy Documents and Reports*, 39.

14. There should be no invidious distinctions between those who teach and/or conduct research in higher education, regardless of whether they hold full-time or part-time appointments or whether their appointments are tenured, tenure-track, or contingent. All faculty members should have access to the same due-process protections and procedures; Regulations 1–10, 12, and 16 therefore apply to all faculty members. The reality however, is that distinctions do exist in the academy. For that reason, Regulation 13 contains recommended provisions that apply only to part-time faculty appointments. This regulation does not apply to faculty members with reduced loads who are probationary for tenure and who have the protections of academic due process that are provided in Regulation 2. It does apply to all other faculty members whose appointments are less than full time, regardless of rank or title and of whether they are paid on a pro-rata, per-course, or any other basis.

15. See *Statement on Procedural Standards in the Renewal or Non-renewal of Faculty Appointments*, in *Policy Documents and Reports*, 94–98, especially the following passages:

> It is easier to state what the standard "adequate consideration" does not mean than to specify in detail what it does. It does not mean that

*Recommended Institutional Regulations on Academic Freedom and Tenure*

the review committee should substitute its own judgment for that of members of the department on the merits of whether the candidate should be reappointed or given tenure. The conscientious judgment of the candidate's departmental colleagues must prevail if the invaluable tradition of departmental autonomy in professional judgments is to prevail. The term "adequate consideration" refers essentially to procedural rather than to substantive issues: Was the decision conscientiously arrived at? Was all available evidence bearing on the relevant performance of the candidate sought out and considered? Was there adequate deliberation by the department over the import of the evidence in the light of the relevant standards? Were irrelevant and improper standards excluded from consideration? Was the decision a bona fide exercise of professional academic judgment? These are the kinds of questions suggested by the standard "adequate consideration."

If, in applying this standard, the review committee concludes that adequate consideration was not given, its appropriate response should be to recommend to the department that it assess the merits once again, this time remedying the inadequacies of its prior consideration.

16. Universities assume responsibilities when they accept graduate students with a promise of financial support. Graduate student employees have a legitimate expectation of fulfillment of the promise unless legitimate cause to terminate support is shown. If the cause relates to the graduate student employee's work and/or academic performance or progress, the employee should be given sufficient time and opportunity to address the concern.

17. According to the Association's *Statement on Collective Bargaining* (*Policy Documents and Reports*, 323–24), "Participation in a strike or other work action does not by itself constitute grounds for dismissal or nonreappointment or for imposing other sanctions against faculty members."

18. For comment on the term *adequate consideration*, see note 15, above.

19. Nonreappointment conditioned on inadequate academic performance as a graduate student may be reviewed in the manner provided in Committee A's statement *The Assignment of Course Grades and Student Appeals*, in *Policy Documents and Reports*, 29–30.

20. Each institution should define with particularity who are members of the academic staff.